**LA ESPERANZA DE P.R., INC.,**
**Plaintiff, Appellant,**

v.

**PEREZ Y CIA. DE PUERTO RICO,**
**INC., Defendant, Appellee.**

**LA ESPERANZA DE P.R., INC.,**
**Plaintiff, Appellee,**

v.

**PEREZ Y CIA. DE PUERTO RICO,**
**INC., Defendant, Appellant.**

**Nos. 96–1904, 96–1905.**

United States Court of Appeals,
First Circuit.

Heard May 7, 1997.

Decided Aug. 13, 1997.

Harry A. Ezratty, for La Esperanza de P.R., Inc.

Juan A. Lopez–Conway, with whom Paul E. Calvesbert and Calvesbert, Alfaro & Lopez–Conway, were on brief, for Perez y Cia. de Puerto Rico, Inc.

Before STAHL, Circuit Judge, ALDRICH, Senior Circuit Judge, and CYR, Senior Circuit Judge.

STAHL, Circuit Judge.

This consolidated admiralty case involves a dispute between a shipowner and a shipyard over repairs to a vessel, S/V LA ESPERANZA, that were begun but never completed. It comes to us on cross-appeals following a bench trial in which the district court entered judgment, first, in favor of Perez y Cia de Puerto Rico, Inc. ("the shipyard" or "Perez") in the amount of $10,999 in its collection action for unpaid work performed pursuant to contract, and, second, in favor of La Esperanza de Puerto Rico, Inc. ("the shipowner") in the amount of $220,000 in its separately brought action for damages resulting from Perez's negligence and breach of contract. *See Perez Y Cia. de P.R., Inc. v. S/V La Esperanza*, 899 F.Supp. 861 (D.P.R.1995).

On appeal, Perez argues that the district court's findings of fact and conclusions of law are erroneous. It contends that the district court erred in finding that it was negligent and in breach of its contractual obligations and argues both that the shipowner's contributory negligence caused the damages that are in issue here and that the ship was worthless when it first arrived at the shipyard, thereby obviating the district court's award of damages in favor of the shipowner.[1] For its part, the shipowner accepts the district court's findings of fact, but seeks to ascribe error to the district court's conclusions of law. Its argument on appeal is that the court erred in enforcing a "red letter clause" in the ship repair contract that limited the shipyard's liability by precluding recovery for loss of use and loss of profits in the event of a breach. The shipowner argues that the liability limitation clause was vitiated on the facts found by the district court because the shipyard's actions, on such facts, constituted gross negligence, not ordinary negligence as the district court concluded. Finally, both parties take issue with the district court's measure of damages. The shipyard argues that the district court erred by ordering it to pay too much; the shipowner, on the contrary, argues that the district court erred by not ordering the shipyard to pay more.

As we do not believe that the district court's determinations were clearly erroneous, we affirm.

### Background and Prior Proceedings

We state the facts consistent with the district court's findings. *See id.* at 862–65.

The S/V LA ESPERANZA ("the vessel" or "the ship") is an eighty-eight foot, steel-hulled, diesel-powered, auxiliary sail schoon-

---

1. We note that LA ESPERANZA was sold at public auction by the U.S. Marshals Service in July 1996 pursuant to its status as the *in rem* defendant in the Perez shipyard's cause of action. The district court granted the shipyard's motion for confirmation of sale and ordered the Mar- shals Service to issue a bill of sale conveying title to LA ESPERANZA to one Jose L. Novas Debien. Our use of the word "shipowner" in this opinion refers exclusively to La Esperanza de Puerto Rico, Inc.

er built in 1896 in Antwerp, Belgium.[2] Her hull consists of an older type of steel, akin to wrought iron, that is no longer used in the construction of ships. The seams of the ship's hull and frames are rivetted and welded.

Julio R. Matos and Enrique Cardona (the principals of La Esperanza de Puerto Rico, Inc.) bought LA ESPERANZA in 1990 for $40,000 with the apparent purpose of refitting her as a passenger vessel for use as a tourist attraction and for sightseeing harbor tours of San Juan, Puerto Rico. To this end, the ship underwent extensive reconstruction and repairs at Vaello Shipyard in Puerto Rico from 1990 to 1992. This work was overseen and approved by the U.S. Coast Guard, which is charged by law to inspect passenger vessels and to certify them for operation. Among the many other things done while the ship was at Vaello, the thickness of the ship's hull was tested in accordance with applicable Coast Guard guidelines by drilling holes at various points to determine those areas that were "wasted" (i.e.,

excessively deteriorated or corroded) and in need of either immediate or eventual replacement.[3] This drillhole gauging indicated that various parts of the hull were in fact wasted. On the basis of these findings, eight hull plates were replaced in accordance with welding procedures developed by Vaello, which had the responsibility for designing the procedures for Coast Guard approval.[4]

LA ESPERANZA's overhaul was completed during the summer of 1992. The total cost of the refitting was financed by loans totalling almost $2,175,000. The refurbished ship had a replacement value of $4.8 million, a physical value of $3.5 million, and an estimated value of $2.8 million. For accounting purposes, the vessel's book value was listed as $1,704,000.

The Coast Guard issued a certificate of inspection for the vessel, which indicated the route that LA ESPERANZA was permitted to run and conditions on the manner of her operation. Specifically, the Coast Guard limited LA ESPERANZA, *inter alia*, to carrying no more than seventy-five passengers

---

2. The district court's opinion lists the ship's length as 122 feet. However, the Coast Guard certificate of inspection and the relevant marine surveys of the vessel contained in the record indicate a length of eighty-eight feet. While our review fails to account for the discrepancy between these figures, we note that it is of no consequence to the legal result in this case.

3. The Coast Guard considers deficiencies in the thickness of hull plating to be a safety concern for steel-hulled vessels because such deterioration, much like buckling, cracks, or fractures, "may affect the strength or integrity of the hull to an extent which would make it unseaworthy." *See* United States Coast Guard, *Navigation and Vessel Inspection Circular No. 7–68; Enclosure (1)—Notes on Inspection and Repair of Steel Hulls* at 1 (1968) [hereinafter *NAVIC*]. Coast Guard inspection guidelines provide that the present thickness of hull plates is to be compared to their original thickness as a means of gauging their present condition. *Id.* at 3–4. "Wastage" refers to the percentage of the original thickness that has deteriorated. Thus, a plate with twenty-five percent wastage has lost twenty-five percent of its original thickness. *Id.* at 4.

Under Coast Guard guidelines, "a local thickness deterioration of up to about 25 percent may be accepted before replacement is necessary," *id.* at 7, but this is not a hard-and-fast rule. "[I]n the application of this percentage, considerable judgment is called for depending upon the location and extent of wasted material. Localized

wastage of some portions of plates . . . in excess of 25 percent may be accepted in many cases, if the condition of the adjacent material is sufficiently good to maintain an adequate margin of strength." *Id.* Indeed, Coast Guard inspectors are afforded a wide latitude of discretion in dealing with the various hull deficiencies they may encounter upon inspection of a vessel. They must "first evaluate if seaworthiness is compromised or not" by these deficiencies, a decision that calls for "considerable discretion because the line of demarcation between what is seaworthy and what is not, is necessarily approximate and subject to some range of interpretation." *Id.* at 2. Among the factors that Coast Guard inspectors "must" weigh in evaluating a particular vessel's hull is "[w]hether the repair work contemplated is necessary to restore seaworthiness or is a maintenance measure to insure prolonged utilization of the vessel." *Id.* "In the first case, repair must be required. In the second case, the details of the condition should be reconsidered at a future inspection and, possibly, called to the attention of the owner so that he may exercise his own good judgement." *Id.*

4. Coast Guard guidelines require that hull replacements, and in particular, the welding and rivetting procedures used in marrying new steel plates to existing older plates, conform with applicable standards and gain Coast Guard approval. *See, e.g., NAVIC* at 24–35 (discussing proper welding and rivetting procedures).

and restricted her passage to "the protected waters of Bahia de San Juan ... within one mile of shore .... [and] to the waters shoreward of buoys 5 and 6 of the Anegado Channel." The certificate of inspection further provided that the ship, when operating its sails, could only set her inner and outer jibs while passengers were on board, but also indicated that up to 150 passengers were allowed on deck when the ship "operate[d] as a moored attraction vessel."

Under these conditions, the vessel thereafter began its passenger service around San Juan Bay. On average, LA ESPERANZA made two trips per day on weekdays and made three or four daily runs on weekends. She was also available for rent for private events.

On March 4, 1994 the shipowner took LA ESPERANZA to the Perez shipyard in San Juan for repairs to her rudder deemed necessary by the Coast Guard. Seeing as the vessel would be dry-docked for the rudder repair, the shipowner decided to accelerate an overall hull inspection that was scheduled for the following month. The Coast Guard inspected the hull and, on March 10, indicated that all hull plates with wastage in excess of fifty percent had to be replaced. The shipyard subcontracted with another firm to perform ultrasonic gauging of the hull in order to identify the candidate plates for replacement. This audio gauging revealed that eighty percent of the ship's hull was wasted twenty-five percent or more from its original thickness. In view of the test results, the Coast Guard required that eighty percent of the hull be replaced, but agreed to allow the shipowner to do the replacement work in stages. As an immediate matter, the shipowner was required to replace the twelve hull plates that were wasted fifty percent or more.

On March 17, the shipowner and the shipyard signed a contract for repairs, with the shipowner paying a deposit of $40,000. The shipyard's quoted estimate of $71,947.20 included, among other things to be done, the replacement of twelve hull plates. The contract encompassed an attached list of conditions. Under section 3(a) of that list, "[t]he Yard commits itself to use materials and execute work to standard ship repair practice." Section 3(b) provided the shipyard the right to "make good at its own workshops and expense any defective work or material [that it] supplied," although the shipowner retained an option to demand, in lieu of such performance, "a sum equal to the cost of such repair." Finally, section 5 provided that "[t]he yard shall in no case be held responsible for the damages resulting from any loss of use or profit of the vessel."

The shipowner hired welders to do the hull replacement work. Despite the fact that the welders did not know the type of steel used in LA ESPERANZA's hull, or the fact that it was an older type of steel no longer used in ship construction, on March 18 they began cutting into the ship's hull with torches in order to remove five of the twelve plates slated for replacement. This work caused a fire with resulting damage to the ship's electrical system. While the method used to remove the hull plates did not require Coast Guard approval, the method for their replacement did. After initial plans were rejected by the Coast Guard, the shipyard's contract manager, Miguel Nin, together with the yard's welding subcontractor, drafted another set of welding procedures that they gave to the shipowner to present to the Coast Guard for approval, but the Coast Guard did not approve the newly submitted procedures. As a consequence, all hull replacement work on the vessel stopped pending development of new welding procedures.

It rapidly became apparent, however, that the Perez shipyard did not possess the ability to perform the hull replacement work on LA ESPERANZA. Nevertheless, on April 6, the shipyard welded five temporary doubler plates onto the hull areas where plates had already been removed. This welding was done too quickly and with excessive heat, causing the older steel of the hull to crack and rivets to loosen.

During this period, the shipowner and shipyard met to discuss the welding procedure problem. The parties met one last time on May 20, 1994 to discuss what arrangements would be made for the vessel in light of the welding difficulties. Although no solution to LA ESPERANZA's predicament was

forthcoming, the shipyard produced a bill for $73,999 for the unfinished hull work and other repairs that it had already done on the ship. Subtracting the $40,000 deposit that the shipowner had previously paid, the shipyard demanded payment for the remaining balance of $33,999.

The shipowner refused to pay. On May 22, 1994, anxious to get other ships into its only dry dock facility, which LA ESPERANZA had now occupied for some two months, the shipyard moved the ship from the dry dock and refloated it. Perez then moved the vessel, operating under its own power, to its tender dock area, an area akin to a floating junk yard. The shipyard recommended two welding experts that the shipowner could hire to develop a welding plan for Coast Guard approval. The shipyard hired one of the two recommended experts, but the expert failed to produce a plan.

Meanwhile, the refloated vessel was taking on water through the cracks in her hull caused by the faulty plate removal and the welding of the temporary plates. The ship was once again removed from the water, water was pumped out, and soft patches using rubber and metal were used to plug leaks, though these too soon began to develop cracks. Surveys conducted at about this time, May and June 1994, revealed that the vessel was tilting to one side because the ballast initially removed in order to gain access to the hull plates for the removal operation had never been replaced. Indeed, when the shipyard refloated LA ESPERANZA, it had placed concrete blocks on the upper deck in lieu of the ship's ballast. During this period, the damaged upper deck itself collected about an inch of water. The surveys revealed that the cost of repairing the vessel to correct the problems with the hull, to repair the damaged upper deck, and to replace damaged wiring, electrical equipment, and carpeting would be between $180,000 and $220,000, not including any possible hidden damages that could not be readily detected while the ship was still in the water.

The shipyard subsequently filed a collection action in federal district court, *in personam* against the shipowner and *in rem* against the vessel itself, for the money it alleged it was owed for the repair work it had performed on LA ESPERANZA. The shipowner filed a separate action against the shipyard for the damages it alleged it suffered as a result of the shipyard's negligence in performing the repair contract. A consolidated trial before the district court sitting in admiralty without a jury was held in September 1995. The court awarded the shipyard $10,999 on its contract collection claim, an amount corresponding to the work that the shipyard actually did on the vessel, minus the amount billed for the defective hull replacement work. The court similarly awarded the shipowner $220,000 for the damages it sustained as a result of the shipyard's negligence in performing the repair work, an amount corresponding to the cost needed to repair the damages to the vessel and to return LA ESPERANZA to the condition it was in before it entered the Perez shipyard. The parties filed motions for additional findings of fact and conclusions of law that were denied by the court. These cross-appeals followed.

### Standard of Review

█ We review a district court's bench trial findings of fact for clear error. *See* Fed.R.Civ.P. 52(a); *McAllister v. United States,* 348 U.S. 19, 20, 75 S.Ct. 6, 7–8, 99 L.Ed. 20 (1954); *Puerto Rico Ports Auth. v. M/V Manhattan Prince,* 897 F.2d 1, 3 (1st Cir.1990). We deem a finding to be clearly erroneous "only when, after reviewing the entire record, we are 'left with the definite and firm conviction that a mistake has been committed.'" *Clement v. United States,* 980 F.2d 48, 53 (1st Cir.1992) (quoting *Deguio v. United States,* 920 F.2d 103, 105 (1st Cir. 1990) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948))).

█ Likewise, "[w]e review questions of negligence" decided in a bench trial "under the clearly erroneous standard." *Id.* (citing *Goudy & Stevens, Inc. v. Cable Marine, Inc.,* 924 F.2d 16, 19 (1st Cir.1991)), *Deguio,* 920 F.2d at 105, and *Obolensky v. Saldana Schmier,* 409 F.2d 52, 54 (1st Cir.1969). In using this standard, our practice accords with the Supreme Court's characterization of neg-

ligence and causation as issues of fact, *see McAllister*, 348 U.S. at 20–23, 75 S.Ct. at 7–9, and is consonant with the rule applied in virtually all our sister circuits, which similarly treat a bench trial finding that a party was negligent as a question of fact, or mixed question of fact and law, and thus do not reverse such a finding unless clearly erroneous. *See generally* Charles Alan Wright & Arthur Miller, 9A *Federal Practice and Procedure* § 2590 at 620–28 (2d. ed.1995) (discussing cases); Steven Alan Childress & Martha S. Davis, 1 *Federal Standards of Review* § 2.28 at 2–220 to 2–227 (2d. ed.1992) (same). *But see Mamiye Bros. v. Barber S.S. Lines, Inc.*, 360 F.2d 774, 776–78 (2d Cir.1966) (per Friendly, J.) (distinguishing *McAllister* as a causation case and holding that clear error standard does not apply to trial court's determination of negligence).

### Negligence, or No Negligence?

On appeal, the shipyard contends that the district court erred in finding that it was negligent and in breach of contract. It argues that the shipowner is really to blame for the damages to LA ESPERANZA and for the fact that the hull repairs were ·never completed. It thus contends that the shipowner was not entitled to the $220,000 awarded by the district court. Even if it was negligent, the shipyard insists, the ship was worthless, thus making the district court's measure of damages erroneous.

The shipowner counters that the district court's error consists in not realizing that the facts it found constituted gross negligence, not ordinary negligence. Because the district court incorrectly decided the gross negligence issue, the shipowner argues, it also incorrectly concluded that the shipyard's liability did not extend to loss of the vessel's use and loss of profit because of the red letter clause contained in the repair contract. That clause, the shipowner argues, precludes recovery for loss of the vessel's use and loss of profits in instances involving ordinary negligence, but not in circumstances involving gross negligence.

■ We address the parties' various claims under federal maritime law because "[a]dmiralty jurisdiction brings with it a body of federal jurisprudence, largely uncodified, known as maritime law." *In re Ballard Shipping Co. v. Beach Shellfish*, 32 F.3d 623, 625 (1st Cir.1994) (citing *East River S.S. Corp. v. Transamerica Delaval*, 476 U.S. 858, 864, 106 S.Ct. 2295, 2298, 90 L.Ed.2d 865 (1986)); *see also Yamaha Motor Corp., U.S.A. v. Calhoun*, —— U.S. ——, ——, 116 S.Ct. 619, 623, 133 L.Ed.2d 578 (1996). · While a contract to construct a ship falls outside federal admiralty jurisdiction because it is "a contract made on land, to be performed on land," *People's Ferry Co. v. Beers*, 61 U.S. (20 How.) 393, 402, 15 L.Ed. 961 (1857), contracts for repairs to a vessel or for its substantial reconstruction come under the scope of admiralty jurisdiction. *See Kossick v. United Fruit Co.*, 365 U.S. 731, 735, 81 S.Ct. 886, 890, 6 L.Ed.2d 56 (1961) (contrasting ship repair and construction); *New Bedford Dry Dock Co. v. Purdy*, 258 U.S. 96, 42 S.Ct. 243, 66 L.Ed. 482 (1922); *see also* 28 U.S.C. § 1333 (granting exclusive federal jurisdiction in "[a]ny civil case of admiralty"); *cf.* Thomas J. Schoenbaum, 1 *Admiralty and Maritime Law* at 111–12 (2d ed.1994). In the absence of a relevant statute, the judicially-developed norms of the general maritime law, "an amalgam of traditional common-law rules, modifications of those rules, and newly created rules," govern actions in admiralty. *East River S.S.*, 476 U.S. at 865, 106 S.Ct. at 2299.

■ We thus must evaluate the merits of the parties' claims against "substantive rules and precepts peculiar to the law of the sea." Schoenbaum, *supra*, at 156 (discussing cases). Under this body of law, a shipowner may sue in either tort or contract for negligent repairs to his vessel. *See Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 412 (5th Cir.1982); *Alcoa S.S. Co. v. Charles Ferran & Co.*, 383 F.2d 46, 50 (5th Cir.1967). A ship repairer potentially faces three sources of liability for repairs he performs improperly on a vessel. He may be liable in contract for a breach of his expressly assumed obligations or for a breach of an implied warranty of workmanlike performance that attaches to admiralty contracts under the rule of *Ryan Stevedoring Co. v. Pan–Atlantic S.S. Corp.*, 350 U.S. 124, 76

S.Ct. 232, 100 L.Ed. 133 (1956). *See Alcoa S.S. Co.* at 50; *see also Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc.,* 866 F.2d 752, 763 n. 17 (5th Cir.1989). A ship repairer may also be liable for the maritime tort of negligence. *See Alcoa S.S.,* 383 F.2d at 50. *See generally* Schoenbaum, *supra,* at 183–84 (collecting cases). Importantly, negligence causes of action in admiralty invoke the principles of maritime negligence, not those of the common law. *See Pope & Talbot, Inc. v. Hawn,* 346 U.S. 406, 408–09, 74 S.Ct. 202, 204–04, 98 L.Ed. 143 (1953). Moreover, while the implied warranty of workmanlike performance "parallel[s] a negligence standard rather than imposing [the] strict liability" that attaches to implied warranties in land-based contracts under the Uniform Commercial Code, *see Employers Ins.,* 866 F.2d at 763 n. 17, "a shipowner may receive indemnity from a marine contractor for breach of implied warranty of workmanlike service, albeit that such performance was done without negligence." *SS Amazonia v. New Jersey Export Marine Carpenters, Inc.,* 564 F.2d 5, 8 (2d Cir.1977) (citing *Italia Societa v. Oregon Stevedoring Co.,* 376 U.S. 315, 324, 84 S.Ct. 748, 754, 11 L.Ed.2d 732 (1964) and *Ryan,* 350 U.S. at 133, 76 S.Ct. at 237). Finally, federally developed maritime law applies both when a court construes the terms of a repair contract and when it construes the standard of performance due thereunder. *See Alcoa S.S.,* 383 F.2d at 50 (citing *Booth S.S. Co. v. Meier & Oelhaf Co.,* 262 F.2d 310 (2d Cir.1958) and *Southport Transit Co. v. Avondale Marine Ways, Inc.,* 234 F.2d 947 (5th Cir.1956)).

■ In this case, the shipyard argues that it was not negligent or in breach of contract because the shipowner, not it, was really at fault for the fact that the hull repairs were never completed. The crux of the shipyard's theory is that the Coast Guard did not disapprove the welding plans for the twelve plates it was supposed to replace because of the method by which the shipyard proposed to do the job, but rather because, at the insistence of the shipowner, an insuffi-

cient number of plates were to be removed. The shipyard argues that it cannot be faulted for the fact that the Coast Guard found the scope of the hull replacements inadequate or for the fact that the shipowner failed to provide the Coast Guard with a comprehensive plan detailing how and when a full eighty percent of the hull with wastage of twenty-five percent or more would be replaced—as the Coast Guard was requiring. The shipyard's theory, in short, is that it could not act to repair the vessel until the Coast Guard approved the repairs, and the Coast Guard would not approve the repairs until the shipowner acted by submitting a comprehensive plan for replacing eighty percent of the hull, not just the twelve plates scheduled for removal and replacement under the contract.

The record simply does not support this argument. In the first place, contrary to the shipyard's contentions, the record does not substantiate the view that the Coast Guard disapproved the welding procedures notwithstanding the shipyard's submission of proper welding procedures. Neither does the record support the shipyard's alternative argument that the Coast Guard "neither approved or disapproved" welding procedures that it submitted because the Coast Guard was not about to deliberate in the absence of a comprehensive plan for additional repairs to LA ESPERANZA. In his deposition, Lt. Comdr. Randal B. Sharpe, the Coast Guard officer in charge of marine safety in San Juan during the relevant period of this dispute, was asked to describe the purpose of the welding procedures submitted to the Coast Guard.[5] He answered that "the purpose of that document was to show us, the Coast Guard, how the shipyard intended to weld the new plate to the old iron hull." When asked whether that proposal met Coast Guard requirements, Lt. Comdr. Sharpe responded, "Parts of the proposal do, yes; parts of the proposal do not." The parts of the proposal that were acceptable, he continued, were those above the load water line, thereby indicating that those below the water line (which presumably were of

---

5. We note that both parties took Lt. Comdr. Sharpe's deposition knowing that he would be

unavailable to testify at trial.

greater significance to the vessel's seaworthiness) were not acceptable. Thus, even if Lt. Comdr. Sharpe's deposition substantiates the uncontroverted fact that no comprehensive plan was submitted (which it does in parts not reproduced here), it also substantiates other record evidence that the shipyard's method of work, in any event, did not pass muster.

Furthermore, Lt. Comdr. Sharpe's deposition supports the view of other witnesses at trial that the shipyard bore the responsibility of furnishing the Coast Guard with appropriate welding procedures because it was a matter of "technical nature," meaning that it was something that "would normally have been submitted either by the shipyard or by the welding contractor who was going to perform the work." Finally, his deposition supports a finding that the shipyard's inability to devise appropriate welding procedures precluded the shipowner from submitting a comprehensive repair plan for the ship's hull with the Coast Guard, not the other way around. "Basically what we were looking for," Sharpe explained in discussing the requirements for approval of the repairs to LA ESPERANZA, "was a proposal on *how* to repair all of the wasted steel.... [T]hat repair proposal ... was supposed to include *what* areas of plate would be replaced; a *time-line* for replacement, and *how* the plate would be replaced." (emphasis added). Because neither the shipyard nor its welding contractor ever devised a welding plan that was acceptable to the Coast Guard on the issue of how the first set of hull plates would be replaced, it is difficult to see how the shipowner, the shipyard, or anyone else could have compiled a comprehensive plan detailing a schedule for the more protracted process of taking out and replacing yet other hull sections. It would thus appear that the shipyard's successful development of a welding procedure acceptable to the Coast Guard was a constructive condition precedent to formulation of a comprehensive plan, and overall Coast Guard approval, rather than vice versa. In any event, we detect no clear error in the district court's implicit allocation of blame on this issue.

Accordingly, the shipyard's contention that it was not liable for negligent performance of the contract cannot withstand close scrutiny. Here, one witnesses a ship that came in for repairs under her own power. Pursuant to a valid, written contract, the shipyard began to make the repairs, but somewhere, somehow, something went wrong. Although the shipyard manager, Miguel Nin, knew that LA ESPERANZA's hull was of an older type steel, and despite the fact that the undisputed evidence revealed that the special quality of LA ESPERANZA's steel should have been readily apparent to any reasonably competent ship repair professional, the welders that Perez hired to cut into LA ESPERANZA did not know what type of steel they were dealing with when they cut into the ship's hull with torches. The method of cutting they employed caused damage to the ship and, to condense a long story, the contracted-for repairs were never completed. Instead of remedying the error and giving the vessel back to the shipowner, the shipyard patched the holes it had already made by welding on temporary plates, causing even more damage to the hull. The shipyard then refloated the ship, which by now was in worse condition than it was prior to arriving for repairs, and placed the ship in its tender dock area. Finally, seeking to extricate itself from a predicament of its own making, the shipyard told the shipowner, essentially, that it (the shipowner) had a problem on its hands, and maybe it should consider hiring a special welding consultant.

This attempt to evade responsibility and escape liability is unavailing. Where the shipyard, like Perez here, "held itself out as a competent shipyard skilled in" doing the type of work requested by the shipowner, the latter "had a right to rely on the expertise of [the shipyard] and had reason to expect a stable seaworthy vessel upon completion of the repairs, regardless of the condition of the boat[ ] prior to repairs." *Empacadora Del Norte, S.A.,* v. *Steiner Shipyard, Inc.,* 469 F.Supp. 954, 962 (S.D.Ala.1979). The contract between the parties does not evince any manifestation of an intent to deviate from this principle. On the *contrary,* under section 3(a) of the *appended list* of conditions, "[t]he Yard commit[ted] itself to use materi-

als and execute work to standard ship repair practice." This contractual clause manifests an intent to bind the shipyard expressly to the otherwise implied warranty of workmanlike performance in marine contracts. In any event, "[t]his warranty need not be express to bind the ship repairer to use the degree of diligence, attention and skill adequate to *complete the task*." *Little Beaver Enters. v. Humphreys Rys., Inc.*, 719 F.2d 75, 78 (4th Cir.1983) (emphasis added) (citing *Coffman v. Hawkins & Hawkins Drilling Co.*, 594 F.2d 152 (5th Cir.1979) and *Tebbs v. Baker–Whiteley Towing Co.*, 407 F.2d 1055 (4th Cir.1969)). The shipyard's failure to complete the hull replacement repairs thus constituted a breach of an express and implied contractual obligation, particularly in view of the fact that evidence in the record substantiates that similarly situated ship repairers could have devised appropriate welding procedures and replaced the hull plates in question. On this record, we cannot ascribe any clear error to the district court's determination that the shipyard was negligent in its manner of performing the contracted-for repairs.

### Negligence or Gross Negligence?

We turn next to the shipowner's argument that the shipyard's actions amounted to gross negligence, not ordinary negligence, and thereby vitiated the red letter clause in the contract limiting the shipyard's liability by precluding recovery for loss of the vessel's use and loss of profit. Whatever else may be said here, we are not convinced that the district court committed clear error when it determined that the shipyard, though negligent, was not grossly negligent in how it undertook to repair the vessel or in how it dealt with it while in its custody.

While exculpatory clauses—commonly referred to as red letter clauses—were traditionally disfavored by courts sitting in admiralty, *see, e.g., Bisso v. Inland Waterways Corp.*, 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955) (refusing to enforce a clause absolving a towing company from all liability for its negligent acts), such clauses are today routinely enforceable. *See East River S.S.*, 476 U.S. at 873, 106 S.Ct. at 2303 (indicating that a marine contractor "can restrict its liability *within limits* by disclaiming warranties or limiting remedies" (emphasis added)). Accordingly, courts today will enforce red letter clauses that are expressed clearly in contracts entered into freely by parties of equal bargaining power, provided that the clause not provide for a total absolution of liability. *See Edward Leasing Corp. v. Uhlig & Assocs., Inc.*, 785 F.2d 877, 888 (11th Cir. 1986); *Todd Shipyards*, 674 F.2d at 410; *Alcoa S.S.*, 383 F.2d at 46. The rationale for upholding such clauses, "so long as no overreaching is found," *Edward Leasing*, 785 F.2d at 888, "is predicated upon the consideration that businessmen can bargain over which party is to bear the risk of damage and set the price accordingly, thus achieving a more rational distribution of the risk [and allocation of price] than the law would otherwise allow." *Jig The Third Corp. v. Puritan Marine Ins. Underwriters Corp.*, 519 F.2d 171, 176 (5th Cir.1975). However, parties may not totally absolve themselves of all liability and, more substantively, the prospective wrongdoer's " 'potential liability' " should be enough to " 'deter negligence.' " *Edward Leasing*, 785 F.2d at 888 (quoting *Alcoa S.S.*, 383 F.2d at 55). A red letter clause, finally, may not limit liability on a marine contract for gross negligence because " 'harm wilfully inflicted or caused by gross or wanton negligence,' " operates to "invalidate an exemption from liability." *Todd Shipyards*, 674 F.2d at 411 (quoting 6A Corbin On Contracts § 1472 (1964 ed.)).

The shipowner submits that the shipyard knew that LA ESPERANZA was made of older steel, but nevertheless hired welding subcontractors who proceeded to cut into the vessel's hull without knowing the nature of the steel they were working on, causing damage to the ship. Moreover, after the shipyard failed to provide welding plans acceptable to the Coast Guard and after it became apparent that the shipyard did not have the expertise to devise such plans (as the district court found), the shipyard nonetheless proceeded to weld temporary plates onto LA ESPERANZA's hull to cover the holes that had been already made, thereby rendering even more damage to the ship by causing the steel in the hull to crack and rivets to loosen.

The shipyard then refloated the vessel to get it out of dry dock, repairs still uncompleted, and moored it with cracks that allowed water to seep into the hull. The shipowner also argues that the shipyard, among other things, improperly moored the vessel without shock-absorbing fenders, improperly secured it against vandals who made off with several radios and liquor from the ship's liquor cabinet, and improperly protected the ship's decks from damaging debris from a sandblasting operation performed near LA ESPERANZA.

As our previous discussion indicates, there was no clear error on the district court's part in determining that such actions breached the shipyard's duty of care to the shipowner. A more difficult question to be resolved is the finding necessary to the district court's determination that the liability limitation clause in question was enforceable, *viz.*, that the shipyard's actions did not amount to gross negligence. While the district court concluded that the Perez shipyard "did not have the expertise to perform the hull replacement work adequately," we cannot say that it was clearly erroneous for the court to conclude that Perez did not act in such a way as to wilfully inflict harm on LA ESPERANZA or to cause her damage in wanton and gross disregard of the vessel or the shipowner's interests in it. *See Todd Shipyards*, 674 F.2d at 411.

The shipyard's subcontracted welders admittedly did not know the quality of the steel on which they were working when they cut into LA ESPERANZA, and because of that failed to adopt the proper heat mixture, causing damage to the ship. But, the record substantiates that the circumstances of this misstep more closely approximate a failure to exercise due care, rather than some modicum of reckless abandon. Nor did the ship-

yard completely ignore its contractual duties. All indications in the record are that it strove in good faith to devise acceptable welding procedures, even if it was unsuccessful and ultimately unable to do so. Moreover, it is not clear that it was unreasonable for the shipyard to believe that it could repair the ship's hull. The shipyard manager, Miguel Nin, had considerable training and experience in marine repair, including advanced degrees in relevant fields of naval architecture. Moreover, as indicated above, at least some portions of the plans that the shipyard submitted met Coast Guard requirements. In addition, while the shipyard damaged the ship's hull somewhat when it welded on temporary plates, it attempted to rectify the short-term damage to the vessel's seaworthiness by applying soft patches to plug leaks and coordinated efforts with the ship's captain to remove water that succeeded in entering the vessel. This feature of the record, too, militates against a finding of gross negligence. Finally, while it became apparent that the shipyard eventually abandoned any effort to make good on its contractual undertaking to repair the vessel, we cannot agree that a material breach of contract is tantamount in this case to gross negligence.

Because nothing in our full review convinces us that a finding of gross negligence was necessitated on these facts, we cannot ascribe clear error to the district court's determination that the liability limitation clause in the contract between the parties was enforceable on its terms. Thus, no recovery was available to the shipowner for loss of the vessel's use or loss of profits because the contract unambiguously provides that "[t]he yard shall in no case be held responsible for the damages resulting from any loss of use or profit of the vessel." [6]

---

**6.** We need not consider at any great length the shipowner's argument that the district court erred in refusing rebuttal testimony to that of the shipyard's manager, Miguel Nin. The shipowner sought to have a former Perez employee, Carlos Claudio, testify that he had informed Nin of the special qualities of LA ESPERANZA's steel and had given Nin a welding plan, which Nin rejected and ignored. The purpose of rebuttal testimony is to meet and reply to any new evidence offered by an opponent. *See United States v.*

*Tejada*, 956 F.2d 1256, 1266–67 (2d Cir.1992). Determinations regarding what constitutes proper rebuttal evidence are committed to the "sound discretion" of the trial court. *See Lubanski v. Coleco Indus., Inc.*, 929 F.2d 42, 47 (1st Cir. 1991). Here, we can discern no apparent error because Nin, who testified that he was in fact aware that the vessel's hull was made of a special older-type steel, never testified that Claudio had not informed him of the steel's quality nor did he

### Damages

Having determined the liability issues as to the parties, we turn finally to the question of remedies, where all of the parties "unite in attacking the district court's basis for assessing damages." *Todd Shipyards*, 674 F.2d at 412. On our full review of the record we find no merit in either party's challenge to the damages awarded by the district court.

 We note that "[t]he trial court, as a fact-finder, possesses considerable discretion in fixing damages, and its decision will be upheld absent clear error." *Little Beaver Enters.*, 719 F.2d at 79 (citing *Thompson v. National R.R. Passenger Corp.*, 621 F.2d 814, 823 (6th Cir.1980)). As a threshold requirement, however, the trial court "must expose 'the measure of damages and method of computation,' both to inform the litigants of the basis for its findings and to afford the appellate court 'a possibility of intelligent review.'" *Id.* at 79–80 (quoting *Safer v. Perper*, 569 F.2d 87, 100 (D.C.Cir.1977)).

 We turn first to consider the $10,999 awarded the shipyard. While the shipowner on appeal asks whether the district court erred in granting the shipyard this relief, the shipowner does not succeed in demonstrating that the court's action in doing so was clearly erroneous. On the contrary, the shipowner concedes that the district court differentiated between negligent work performed and work properly done to the vessel and awarded the shipyard $10,999 for satisfactorily completed non-hull repair work. In fact, the district court's opinion stated that it would disallow any recovery by the shipyard for the hull replacement work that it either failed to do or negligently performed and would allow recovery only for the other work that it had adequately performed pursuant to the contract. It thus deducted $23,000 from the shipyard's $33,999 invoice, an amount equal to what the shipyard was seeking for hull replacement work, and determined that the shipyard was entitled to recovery on its collection action in the amount of $10,999. *See Perez y Cia. de P.R.*, 899 F.Supp. at 866. This determination was not clearly erroneous

and, therefore, the shipowner's argument is unavailing.

 Similarly, we see no clear error in the court's decision to award the shipowner $220,000. For its part, the shipyard argues that the district court erred in accepting valuations of the ship's worth from the shipowner's expert witness, rather than its own expert witness, who testified that LA ESPERANZA was only worth her "scrap value," i.e., was basically worthless. The gist of the shipyard's contention here is that its expert was more qualified to render an appraisal value than the shipowner's expert, who was not an appraiser *per se*, but rather a marine surveyor. The record substantiates, however, that marine surveyors like the shipowner's expert routinely inspect and value ships for insurance coverage purposes, prospective sales, and so forth, and are fully competent to offer their professional opinion as to what a vessel is worth. This is a classic case of dueling experts and it is not reversible error that the district court was more persuaded by the range of valuations offered by the shipowner's expert rather than the other way around.

 The shipowner, meanwhile, argues that the district court should have awarded more than $220,000 because it was entitled to loss of use and interest paid on loans taken out to refit and repair LA ESPERANZA. The shipowner's expert opined that the cost of repairs to the vessel would have been in the range of $180,000 to $220,000 plus possible "hidden damages" that were not easily ascertained while the ship was still in the water. The district court did not commit reversible error in accepting the range of figures offered to it by the shipowner's expert, in selecting the upper-most figure in that range, and then declining to exceed that figure based on speculation about costs to repair damage that might or might not exist. To the extent that the shipowner is heard to complain that it should not bear the burden of interest, loans, and loss of use, we believe that the red letter clause and the district court's generous award as to actual damages

testify that Claudio had not presented him with a

welding plan.

precludes a determination of clear error on appeal.

### Conclusion

Having carefully reviewed the record in this case, we believe that the district court's determinations as to liability and the proper measure of damages recoverable by the respective parties in this dispute were not clearly erroneous. We thus discern no cause to disturb the judgments rendered below.

*Affirmed.* **No costs.**