# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 02-1531

_____

Joseph Sander; Barbara Sander; Ivy    *
M. Smith; Ruby Smith; Lawson    *
Burford; Mary Burford,    *
    *      Appeal from the United States
      Appellees,    *      District Court for the
    *      Eastern District of Missouri.
    v.    *
    *      [PUBLISHED]
Alexander Richardson Investments,    *
doing business as Yacht Club of St.    *
Louis,    *
    *
      Appellant.    *

_____

Submitted: November 4, 2002
Filed: July 1, 2003

_____

Before HANSEN,[1] Chief Judge, BEAM and RILEY, Circuit Judges.

_____

HANSEN, Circuit Judge.

_____

[1]The Honorable David R. Hansen stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2003. He has been succeeded by the Honorable James B. Loken.

Boats owned by Joseph and Barbara Sander, Ivy M. and Ruby Smith, and Lawson and Mary Burford (collectively "the boat owners") were destroyed while moored at the Yacht Club of St. Louis ("Yacht Club") when another boat caught fire. The boat owners sought recovery from the Yacht Club, which defended based on an exculpatory clause in the Boat Space Rental Agreement ("slip agreement") that the Yacht Club had with each of the boat owners. The district court granted recovery to the boat owners, from which the Yacht Club appeals. Siding with the Fifth and Ninth Circuits in an existing circuit split concerning the enforceability of exculpatory clauses in marine contracts, we reverse the district court's judgment.

I.

Ronald and Martha Jessup owned the motor vessel (M/V) A-OK, a houseboat, which they moored at the Yacht Club marina. After noticing a fuel leak near the starboard engine fuel pump, Mr. Jessup approached the Yacht Club's service department to discuss needed repairs. The service manager informed Mr. Jessup that he would be unable to repair it in the time frame Mr. Jessup requested. The Yacht Club's general manager suggested to Mr. Jessup that he hire Charlie Shulte, a Yacht Club maintenance worker, to repair the fuel leak, assuring Mr. Jessup that Mr. Shulte was qualified to perform the repair work. Mr. Jessup hired Mr. Shulte, who determined that the fuel pump needed to be replaced and installed a new pump.

Mr. Jessup returned to the boat three days after Mr. Shulte replaced the fuel pump to show the boat to an interested buyer. After starting the boat and letting it run for a period of time, Mr. Jessup heard a loud thud that was later described as an explosion. Flames engulfed the hatch area where the engines were located. Mr. Jessup was unable to extinguish the flames with a fire extinguisher and the boat became engulfed. The fire spread to other docks of the marina and ultimately destroyed the M/V Never Better, owned by the Sanders, the M/V My Prerogative, owned by the Smiths, and the M/V Lady Ellen, owned by the Burfords.

The Jessups brought an action in federal district court seeking exoneration from, or limitation of liability for, all claims arising from the incident. Each of the boat owners filed claims within the suit against the Jessups and the Yacht Club, and the Yacht Club and the Jessups filed claims against each other. The claims against the Yacht Club were premised on a negligence theory, alleging that Mr. Shulte improperly installed the fuel pump, which caused the fire, and that the Yacht Club was liable for assuring Mr. Jessup that Mr. Shulte was qualified to perform the repair, when in fact he was not.

The Yacht Club defended against the boat owners by asserting that an exculpatory clause printed on the back of each boat owner's slip agreement exonerated it from any liability for damages caused by the fire. The clause read as follows:

> 19. INSURANCE: TENANT AGREES that he will keep the boat fully insured with complete marine insurance, including hull [property] coverage and indemnity and/or liability insurance.
>
> THE LANDLORD DOES NOT CARRY INSURANCE covering the property of the TENANT. THE LANDLORD WILL NOT BE RESPONSIBLE for any injuries or property damage resulting, caused by or growing out of the use of the dock or harbor facilities; that the TENANT RELEASES AND DISCHARGES THE LANDLORD from any and all liability for loss, injury (including death), or damages to person or property sustained while in or on the facilities of LANDLORD, including fire, theft, vandalism, wind storm, high or low waters, hail, rain, ice, collision or accident, or any other Act of God, whether said boat is being parked or hauled by an Agent of LANDLORD or not.

(App. of Exs., tab 2.) The case was tried to the bench and the district court found that the Jessups were not negligent. The court also found that the fire resulted from the improper installation of the fuel pump by Mr. Shulte, an agent of the Yacht Club, and

3

that Mr. Shulte's actions constituted negligence on the part of the Yacht Club. The district court found that the exculpatory clause did not release the Yacht Club from liability for its own negligence because "exculpatory clauses that completely absolve a party from all liability are invalid." (Add. at 10.) The court found alternatively that the exculpatory clause did not clearly and unequivocally indicate that it released the Yacht Club from liability for its own negligence, and that the provision was overreaching because of the unequal bargaining power of the parties. (Id.) The court ordered the Yacht Club to pay $60,000 to the Sanders, $49,400 to the Smiths, and $58,600.50 to the Burfords as the value of their respective boats.

The Yacht Club appeals, arguing that the clause is sufficiently clear to release it from liability stemming from its own negligence, and urging us to adopt the views of the Fifth and Ninth Circuits, which enforce exculpatory clauses that fully exonerate a party from liability for its own negligence. The Yacht Club does not dispute the district court's finding that it was negligent. The Jessups are not parties to this appeal.

II.

The issues of the validity of an exculpatory clause and the construction of a contract, including whether it is ambiguous, are legal issues that we review de novo. Western Forms, Inc. v. Pickell, 308 F.3d 930, 933 (8th Cir. 2002). We will reverse the district court's determination of the parties' intentions in an ambiguous contract and its finding of unequal bargaining power only if those factual findings are clearly erroneous. In re Y & A Group Sec. Litig., 38 F.3d 380, 383 (8th Cir. 1994) (parties' intent); Dillingham Tug & Barge Corp. v. Collier Carbon & Chem. Corp., 707 F.2d 1086, 1090 (9th Cir. 1983) (unequal bargaining power), cert. denied, 465 U.S. 1025 (1984). Because the subject matter of the contract at issue–the slip rental agreement–is maritime, we apply admiralty law. See S.C. State Ports Auth. v. Silver Anchor, S.A., 23 F.3d 842, 846 n.3 (4th Cir. 1994) ("[C]ontracts for wharfage, dockage, and crane rental are maritime."). "[A]dmiralty jurisdiction brings with it a

4

body of federal jurisprudence, largely uncodified, known as maritime law." La Esperanza de P.R., Inc. v. Perez y Cia. de P.R., Inc., 124 F.3d 10, 16 (1st Cir. 1997) (internal quotations omitted).

There is a split in the circuit courts of appeals on the issue of whether, under admiralty law, an exculpatory clause (also called a red letter clause) that fully absolves a party from liability for its own negligence is enforceable. Compare Diesel "Repower," Inc. v. Islander Invs. Ltd., 271 F.3d 1318, 1324 (11th Cir. 2001) ("[T]he limitation [in a red letter clause] must not absolve the repairer of all liability and must still provide a deterrent to negligence.") and La Esperanza, 124 F.3d at 19 ("[P]arties may not totally absolve themselves of all liability and, more substantively, the prospective wrongdoer's potential liability should be enough to deter negligence." (internal quotations omitted)), with Royal Ins. Co. of Am. v. S.W. Marine, 194 F.3d 1009, 1014 (9th Cir. 1999) ("[E]xcept in towing contracts, exculpatory clauses are enforceable even when they completely absolve parties from liability for negligence." (footnote omitted)) and Theriot v. Bay Drilling Corp., 783 F.2d 527, 540 (5th Cir. 1986) (applying federal maritime law and enforcing indemnity agreement that fully exculpated party from liability for its own negligence). We will address that issue shortly, but we turn first to the issue of whether the contract provision at issue was sufficiently clear to absolve the Yacht Club of liability for its own negligence, for it is universally agreed that exculpatory clauses, whether fully exonerating a party from its own negligence or not, must "be clearly and unequivocally expressed." Randall v. Chevron U.S.A., Inc., 13 F.3d 888, 905 (5th Cir. 1994) (internal quotations omitted). See also Edward Leasing Corp. v. Uhlig & Assocs., Inc., 785 F.2d 877, 889 (11th Cir. 1986) (recognizing that courts will enforce red letter clauses if "the contractual language at issue is clear and unequivocal and clearly indicates the intentions of the parties"); M/V Am. Queen v. San Diego Marine Const. Corp., 708 F.2d 1483, 1488 (9th Cir. 1983) (holding parties to an exculpatory clause where the parties' intent is clear).

5

## A. Is the Exculpatory Clause Sufficiently Clear?

The clause at issue here required the boat owner to carry full property insurance on the boat and informed the boat owner that the marina did not carry insurance that covered the boat owner's property, including the boat. It further provided that "THE LANDLORD WILL NOT BE RESPONSIBLE for any injuries or property damage resulting, caused by or growing out of the use of the dock or harbor facilities; that the TENANT RELEASES AND DISCHARGES THE LANDLORD from any and all liability for loss, injury (including death), or damages to person or property sustained while in or on the facilities of LANDLORD, including fire . . . ." (App. of Exs., tab 2.) The boat owners argue that it is not enough that the clause released the marina from <u>all</u> liability, it must do more by specifically referring to liability caused by the marina's own fault. The boat owners made clear during oral argument that they do not suggest that the clause is deficient for not using the magic term "negligence,"[2] but argue that it must refer to liability arising from the marina's fault in some manner. We recognize that the Supreme Court of Missouri requires something more, see <u>Alack v. Vic Tanny Int'l of Mo., Inc.</u>, 923 S.W.2d 330, 337 (Mo. 1996) (en banc) (holding that exculpatory clause in health club membership did not exculpate the facility from liability for a personal injury stemming from the facility's negligence because the clause did not use the term "negligence," "fault," or equivalents), but we are applying federal maritime law, which must control our construction of the contract at issue.

Despite the alleged shortcomings, we hold that the clause releasing the Yacht Club "from <u>any and all</u> liability for . . . damages to . . . property . . . ., including fire" (App. of Exs., tab 2 (emphasis added)), unambiguously released it from liability stemming from its own negligence. Even in maritime law, we construe contracts by

---

[2]See <u>United States v. Seckinger</u>, 397 U.S. 203, 213 n. 17 (1970) ("We specifically decline to hold that a clause that is intended to encompass indemnification for the indemnitee's negligence . . . must explicitly state that indemnification extends to injuries occasioned by the indemnitee's negligence.").

giving their terms their normal and everyday meaning. We look to the contract as a whole to determine whether it unambiguously states the parties' intentions. The slip agreement clearly shifted the risk of loss to the boat owners by requiring the boat owners to fully insure their boats, including hull coverage. The agreement informed the boat owners in capital letters that the marina did not carry insurance that would cover the property of the boat owners. The term "any and all" used in the exculpatory clause is all-encompassing and leaves little doubt as to the liability from which the boat owners released the Yacht Club. "In short, 'all' means all." Knott v. McDonald's Corp., 147 F.3d 1065, 1067 (9th Cir. 1998) (enforcing clause in which franchise seller assigned "all [their] right, title and interest" to the buyer, including cause of action for breach of franchise agreement).

We decline to accept the boat owners' invitation to require more than "all" when the liability at issue stems from the Yacht Club's own negligence. The agreement as a whole clearly shifted the risk of loss to the boat owners and exculpated the marina from liability for damage resulting from the fire. When language is this explicit, "it is beyond the province of this Court to imply limitations or conditions on the exercise of a power to allocate risks so unmistakably expressed." Morton v. Zidell Explorations, Inc., 695 F.2d 347, 351 (9th Cir. 1982) (construing clause providing that "all risk of loss of or damage to the Vessel shall be upon First Party" and "Second Party shall not, under any circumstances whatsoever, be chargeable with or liable for damages . . . ."), cert. denied, 460 U.S. 1039 (1983). Even those circuits that are hostile to exculpatory clauses have found similar language equally unambiguous. See La Esperanza, 124 F.3d at 20 (holding a contract clause stating that "[t]he yard shall in no case be held responsible for the damages resulting from any loss of use or profit of the vessel" to be unambiguous). But see Randall, 13 F.3d at 906 (holding that clause indemnifying party "for losses 'howsoever arising' [was not] sufficiently clear and unequivocal to shift liability for Chevron's negligence onto Sea Savage"). Having determined that the exculpatory clause unambiguously included liability for damage caused by a fire stemming from

the Yacht Club's negligence within its exclusion, we must determine whether the clause is enforceable.

## B. Does the Exculpatory Clause Contravene Public Policy?

This case pits two competing public policy doctrines against each other: holding parties responsible for their actions by limiting their ability to absolve themselves from liability for their own negligence versus recognizing the liberty to contract. The circuits are in agreement that while exculpatory clauses were generally disfavored by admiralty courts, such clauses are routinely enforced today based on "the consideration that businessmen can bargain over which party is to bear the risk of damage and set the price accordingly, thus achieving a more rational distribution of the risk and allocation of price than the law would otherwise allow." See La Esperanza, 124 F.3d at 19 (internal quotations omitted); Edward Leasing, 785 F.2d at 888 (same). The rub comes from whether a party should be allowed to absolve itself from all liability for its own negligence.[3]

The boat owners urge us to adopt the reasoning of the First and Eleventh Circuits. Both of those circuits have stated that exculpatory clauses in maritime contracts are valid and enforceable if the limitation of liability is clear and unequivocal, the clause does not absolve a party from all liability for its own negligence, the liability risk provides a deterrent to negligence, and the parties are of equal bargaining power. See Diesel "Repower," Inc., 271 F.3d at 1324 (upholding warranty in ship repair contract that limited liability to the purchase price of the parts purchased); La Esperanza, 124 F.3d at 209 (upholding ship repair contract that limited liability to cost to repair and excluded recovery for loss of use or profit of

---

[3]We note that no circuit has allowed a party to absolve itself from higher levels of culpability, including gross negligence or recklessness. See Royal Ins. Co., 194 F.3d at 1015. That issue is not before us, however, as this case deals with ordinary negligence.

vessel). The rationale for the limitation on exculpatory clauses stems from the Supreme Court case of Bisso v. Inland Waterways Corp., which held that an exculpatory clause in a towage contract violated public policy. See 349 U.S. 85, 90-91 (1955).

The Ninth Circuit has distinguished Bisso and limited it to cases involving towage contracts, see Morton, 695 F.2d at 350 ("Bisso merely reaffirmed the rule applicable to tugboat towing . . . ."), and we think rightly so. See also Kerr-McGee Corp. v. Law, 479 F.2d 61, 64 (4th Cir. 1973) (enforcing exculpatory clause in private carriage contract and noting that both before and after Bisso, exculpatory clauses in private contracts of affreightment have been upheld against public policy attacks). The Bisso Court explained, "This rule [that release-from-negligence clauses in towage contracts are unenforceable] is merely a particular application to the towage business of a general rule long used by courts and legislatures to prevent enforcement of release-from-negligence contracts in many relationships such as bailors and bailees, employers and employees, public service companies and their customers." Bisso, 349 U.S. at 90-91 (internal footnotes omitted). The purpose of the rule in towage contracts is two-fold: "(1) to discourage negligence by making wrongdoers pay damages, and (2) to protect those in need of goods or services from being overreached by others who have power to drive hard bargains." Id. at 91. The Supreme Court explained that the rule was first articulated during "an era of manifest judicial hostility toward release-from-negligence contracts particularly those made by businesses dealing widely with the public and having potentially monopolistic powers." Id. at 89 (discussing The Wash Gray, 277 U.S. 66 (1928) and The Steamer Syracuse, 12 Wall. 167, 20 L. Ed. 382 (1871)).

During that same period of judicial hostility toward exculpatory clauses, the Supreme Court upheld a liability exemption clause between a railroad and a construction company because the railroad was not acting as a common carrier. See Santa Fe, Prescott, & Phoenix Ry. Co. v. Grant Bros. Const. Co., 228 U.S. 177, 184-

85 (1913). The railroad had contracted with the construction company to extend the railroad's rail lines and agreed to haul the equipment and men necessary to perform the work to the end of the existing line. The contract provided that "[a]ll risk of loss or damage to be borne by the contractor." Id. at 183. Following a fire on one of the rail cars, the construction company sued the railroad to recover damages for property lost in the fire. The Court explained the long standing doctrine "that common carriers cannot secure immunity from liability for their negligence by any sort of stipulation" based on "broad grounds of public policy." Id. at 184. The Court noted that the rule, which restricted the liberty to contract, was justified by "[t]he great object of the law governing common carriers [which] was to secure the utmost care in the rendering of a service of highest importance to the community" and the fact "that the carrier and the individual customer are not on equal footing." Id. at 184-85. The Court went on to hold, however, that "[t]he rule extends no further than the reason for it," id. at 185, and that because the railroad was not acting in its capacity as a common carrier, the contract clause was enforceable.

The reasoning of Santa Fe convinces us that Bisso's limitation on exculpatory clauses should be limited to towage contracts, which have been likened to common carriers. In fact, Justice Douglas concurred on the basis that "tugboats are common carriers when they so hold themselves out." Bisso, 349 U.S. at 96 (internal footnote omitted). The Bisso majority compared the "particular application [of the rule] to the towage business" to other similar relationships, including bailors and bailees, employers and employees, and public service companies and their customers. Id. at 90-91. The Supreme Court has limited the rule within maritime jurisprudence, upholding an exculpatory clause in a pilotage contract, wherein a pilot from a tow agreed to pilot a vessel that the tow was assisting and the contract exempted the tow company from liability arising from the pilot's negligence. See Sun Oil Co. v. Dalzell Towing Co., 287 U.S. 291, 294 (1932). Noting that the "services covered by the contract were less than towage," id., the Court held that "[t]here is no foundation in this case for the application of the doctrine that common carriers and others under like

10

duty to serve the public according to their capacity and terms of their undertaking cannot by any form of agreement secure exemption from liability for loss or damage caused by their own negligence." Id. Because the tow company did not operate a monopoly on pilotage services and the petitioner was not compelled to accept the terms of the agreement, the Court concluded that "'the matter lies within the range of permissible agreement, [and] the highest public policy is found in the enforcement of the contract which was actually made.'" Id. (quoting Santa Fe, 228 U.S. at 188).

Thus, we believe that within admiralty law, the doctrine prohibiting a party from completely absolving itself from liability for its own negligence is limited to circumstances involving relationships similar to towage agreements, such as bailment, employment, or public service relationships. The Supreme Court has explained the circumstances justifying the limitation of exculpatory clauses in those situations as those involving a monopoly or unequal bargaining power. Bisso, 349 U.S. at 91-92 & n.19; Sun Oil, 287 U.S. at 294. Where the peculiarities of those types of relationships do not justify application of the doctrine, we uphold the strong public policies of recognizing parties' liberty to contract and enforcing contracts as written.

We think this is especially true in the relationship at issue in this case, which involved a marina and a boat owner contracting to rent a slip at the marina to dock a boat. The slip rental cases we have located recognize exculpatory clauses that absolve the marina from all liability as valid contractual negotiations. See Woodworth v. Tacoma Yacht Club, 377 F.2d 486, 488 (9th Cir. 1967) (noting validity of clause but holding it inapplicable when marina employees moved boat out of marina, which was not covered by slip agreement); Commercial Union Ins. Co. v. Blue Water Yacht Club Ass'n, 239 F. Supp. 2d 316, 321 (E.D.N.Y. 2003) (noting that "[w]here the exculpatory agreement states in unequivocal terms the intention of the parties to relieve a defendant of her liability for negligence, the agreement will be enforced," but finding the slip rental agreement to not be sufficiently clear as to the parties' intentions); In re Wechsler, 121 F. Supp. 2d 404, 433-34 (D. Del. 2000)

11

(noting the circuit split and following the Ninth Circuit's approach, finding it more persuasive given the circumstances of the case, which involved boat owners who could have attempted to negotiate with the marina or "simply moored their vessels at a different marina with a more favorable rental agreement"); Commercial Union Ins. Co. v. Bohemia River Assocs., Ltd., 855 F. Supp. 802, 806 (D. Md. 1991) (noting that "exculpatory clauses of this type are enforceable only if the clause sufficiently reflects the parties' intention to absolve the marina of liability for its own negligence," but finding the clause insufficiently clear because it did not use the term "negligence" as required under Maryland state law) (internal quotations omitted)).

We believe that the cases from the First and Eleventh Circuits can be distinguished on this basis because those cases involved ship repair contracts as opposed to slip rental agreements. A ship repairer who takes control of a vessel and enters an agreement to perform work on the vessel is in a much different situation than a marina that provides a dock to which numerous boat owners have access and dock their boats. Thus, we limit our holding–that an exculpatory clause that absolves a marina from liability for its own negligence is enforceable as long as the parties' intent to do so is clear and the clause is not the result of overreaching–to clauses contained in slip rental agreements, and we leave for another day the broader question of whether exculpatory clauses are valid in all maritime contracts save towage agreements.

We have already determined that the clause is clear and unambiguous. Our final inquiry is whether the Yacht Club exerted unequal bargaining power over the boat owners or engaged in overreaching. We defer to the district court's factual findings related to these inquiries unless they are clearly erroneous. The district court, without discussion of the negotiations between any of the parties, found that "the parties to the agreement do not have equal bargaining power." (Add. at 9.) The only facts stated by the district court to support its conclusion were that "[t]he Yacht

12

Club is a corporation and the claimants are individuals who own leisure vessels" and the slip rental agreements are "form contracts." (Id.)

Although the district court's observation that the Yacht Club is a corporation and the boat owners are individuals is accurate, it does little to inform the issue of whether the Yacht Club exerted unequal bargaining power. See, e.g., Royal Ins. Co., 194 F.3d at 1014 (finding no overreaching in contract between individual boat owner and corporate ship repairer). It is not enough to assert that one party was less sophisticated than the other. There must be some evidence that the party holding the superior bargaining power exerted that power in overreaching the less sophisticated party by, for example, engaging in fraud or coercion or by insisting on an unconscionable clause. See Outek Caribbean Distribs., Inc. v. Echo, Inc., 206 F. Supp. 2d 263, 268 (D.P.R. 2002) (rejecting claim of unequal bargaining power although one party refused to negotiate certain terms because "[u]nder Outek's theory, any individual that had signed a form contract with a large corporation could subsequently invalidate any contract clauses that he considered to be unpleasant simply by claiming the existence of unequal bargaining power.") Similarly, the mere fact that the contracts were form contracts does not per se lead to the conclusion that the Yacht Club engaged in overreaching. See Surman v. Merrill, Lynch, Pierce, Fenner & Smith, 733 F.2d 59, 61 n.2 (8th Cir. 1984) (noting that standardized contracts of adhesion are not per se unenforceable, but courts must determine whether a particular clause is unconscionable (citing 6A A. Corbin, Contracts § 1376, at 20-22 (1962))). Without further factual support, the district court's conclusion that the exculpatory clause was the result of overreaching is clearly erroneous, as it relies on facts that are insufficient as a matter of law to establish overreaching.

The parties have directed us to no further evidence to support the district court's finding of overreaching by the Yacht Club. While the facts addressing the issue of overreaching or unequal bargaining power are not well developed in the record, the parties agree that there were several other marinas in the area and that the

Yacht Club negotiated at least some of the terms of the slip agreement as evinced by the fact that the Jessups negotiated a month-to-month lease with the Yacht Club although the Yacht Club normally required an annual lease. (App. of Exs., tab 1.) None of the boat owners claim that they attempted to negotiate any of the terms of the slip agreement and were unable to do so because of the Yacht Club's superior bargaining power or refusal to negotiate or that they even objected to the exculpatory clause. On this thin record, the boat owners simply failed to establish that the exculpatory clause was the result of overreaching. See Royal Ins. Co., 194 F.3d at 1014 (noting that courts "have refused to invalidate an exculpatory provision in a ship repair contract where the ship's owner assented without complaint to the terms of the agreement" (internal quotations omitted)); Woodworth, 377 F.2d at 488 (dismissing claim of unequal bargaining power in slip rental case because the boat owners "did not have to join the club"); Wechsler, 121 F. Supp. 2d at 434 (finding no monopolistic power where boat owners were free to accept or reject slip rental agreement and could have moored their vessels at a different marina).

III.

We hold that the exculpatory clause contained in the slip rental agreements is valid and enforceable. The agreement clearly and unequivocally shifted the risk of loss to the boat owner and released the Yacht Club from all liability, including that liability arising from its own negligence. Public policy demands enforcing contracts as written and recognizing the parties' freedom to contract. The district court's judgment awarding the boat owners recovery against the Yacht Club is reversed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

14