[NOT FOR PUBLICATION] 
United States Court of Appeals
For the First Circuit

No. 97-1844

LUCY APPLEYARD,

Plaintiff, Appellee,

v.

JOHN W. DOUGLASS, JR.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Zachary R. Karol, U.S. Magistrate Judge]

Before

Selya, Circuit Judge,

Bownes, Senior Circuit Judge,

and Stahl, Circuit Judge.

Philip R. Olenick for appellant.

John A. James, Jr. for appellee. 

March 6, 1998

BOWNES, Senior Circuit Judge. Federal jurisdiction in
this action to recover the balance due on a promissory note is
based on diversity of citizenship. Lucy Appleyard, plaintiff-
appellee, is the holder of a note from J.W. Douglass Corporation
(Douglass Corp.) to Appleyard Motor Transportation Company, Inc.
(Appleyard Motor), which was personally guaranteed by John W.
Douglass, defendant-appellant. The note was given by Douglass
Corp. to Appleyard Motor as part of the price paid by Douglass for
the purchase of Appleyard Motor's business and assets. The
relevant facts are not in dispute, but the parties differ sharply
as to the legal and factual conclusions to be drawn from them.
I
We rehearse the relevant facts. Appleyard Motor
transported gasoline and other petroleum products. Its annual
revenue approximated $2.5 million. Its sole stockholder was John
Appleyard, husband of plaintiff. Douglass Corp. was also in the
trucking business. In addition to gasoline and petroleum products
it transported ready mix concrete and sand and gravel. Douglass
Corp.'s annual revenues were approximately $20 million.
Sometime before September 16, 1988, the two corporations
entered into negotiations for the sale of Appleyard Motor's
business and assets to Douglass Corp. John Appleyard died on
September 16, 1988. His will, which had been executed in
Massachusetts, was probated in the Probate Court of Rockingham
County, New Hampshire, where John Appleyard and his wife, Lucy,
lived at the time of John's death. John's will named plaintiff
(Lucy Appleyard) executrix. It bequeathed all of John's tangible
personal property to her.
John Appleyard had created a trust which provided that
his residuary estate was to be divided into three subtrusts: 
Trusts A, B, and C. The trustees were the adult children of John
Appleyard. There are no minor children. Trust A was for
plaintiff's exclusive benefit; she received all the income and had
discretion to withdraw as much of the principal as she wanted. The
trustees of Trust A had the right to pay to plaintiff as much of
the principal from all three trusts as was deemed necessary for the
comfort and support of plaintiff. One of the adult children,
Nancy, lived in Massachusetts at the time the trusts were created
and still lives there. Trusts B and C are of no relevance.
Under the will, the residue of John Appleyard's estate
went to the trustees of Trust A. It is agreed by the parties that
the residue included John's stock in Appleyard Motor. Contrary to
the will, the residuary estate was not transferred to the trustees
of the trust. Plaintiff, as executrix, transferred the entire
estate to herself on March 1, 1990. This was stated in her first
and final account, which was allowed by the probate court on
September 11, 1990. There were no objections to this transfer by
any of the trustees, who were identified by name and address in the
final account as beneficiaries of the estate and who had received
notice of the filing of the account as required by New Hampshire
law. 
We now must backtrack. Negotiations between the two
companies continued after John Appleyard's death. On November 23,
1988, plaintiff, as the new president of Appleyard Motor, executed
a purchase and sale agreement with Douglass Corp. Under the
agreement Appleyard Motor sold its business and tangible assets to
Douglass Corp. for $800,000.00. Douglass Corp. paid $500,000.00
cash and gave Appleyard Motor a non-negotiable promissory note for
the balance of $300,000.00 payable monthly with interest at 10%. 
This broke down to thirty-five monthly payments in the amount of
$9,680.16 each. John W. Douglass, Jr., defendant, personally
guaranteed the note. Douglass Corp. made eleven monthly payments
directly to plaintiff in her name for a total of $106,481.76.
The record is silent as to how plaintiff became the
president of Appleyard Motor. There were, however, no objections
by any of the trustees to her assumption of the office. Plaintiff
testified that she did not have any day-to-day knowledge of the
business and that her lawyer and accountant handled everything. 
She also testified that the defendant, John W. Douglass, Jr., never
raised a claim about misrepresentations by her or Appleyard Motor
or claimed that the balance was not due on the note. At the time
suit was brought, the outstanding balance on the note was
$217,644.00. Before bringing suit plaintiff discussed the matter
with her children; they approved commencement of the suit and have
followed its progress.
The purchase and sale agreement contained the following
statement: "[T]o the best of its knowledge and belief, [Appleyard,
Motor] is in full compliance with all laws and regulations which
apply to the conduct of its business, including all laws and
regulations relating to employment."
Douglass Corp. stopped payments on the note as of
November, 1989. In January of 1990, Douglass Corp. filed a chapter
11 bankruptcy petition. On January 4, 1991, the Massachusetts
Secretary of State involuntarily dissolved Appleyard Motor under
chapter 156, section 101 of the Massachusetts General Laws. The
complaint in this action was filed on January 19, 1995.
II
There were essentially two issues tried before the
magistrate judge: the standing of plaintiff to bring suit and
damages. Our standard of review for factual findings is clearly
erroneous, and de novo for legal conclusions. We start with
standing. Defendant argues at length in his brief, as he did in
the district court, that the case should have been dismissed for
lack of subject matter jurisdiction. His argument is based on the
assertion that plaintiff did not prove her "standing" to sue the
defendant-guarantor for the unpaid balance on the promissory note. 
The "standing" argument is based on two premises. First, 
plaintiff did not prove that she was the rightful owner of
Appleyard Motor stock. Second, without formal action either by
Appleyard Motor's directors or a court of the Commonwealth,
Appleyard Motor's assets cannot be distributed and remain in the
corporation, "even after dissolution, as it may be revived at any
time." We note that if suit had been brought by the trustees,
there would be no diversity jurisdiction because one of the
trustees lived in Massachusetts.
We think defendant's contentions are mainly smoke and
mirror creations. We have no problem affirming the magistrate
judge on the standing issue. The bedrock facts are that plaintiff
had at all pertinent times physical possession of the note and
guarantee. Eleven payments were made to her individually. None of
the trustees the three adult children of plaintiff and her late
husband objected to her taking on the role of president of
Appleyard Motor after her husband died. We agree with the
magistrate judge, "that the trustees voluntarily and knowingly
acquiesced and approved the transfer of Appleyard Motor
Transportation Company Inc.'s shares from plaintiff as executrix to
herself individually." Moreover, as already noted, the eleven
payments by Douglass Corp. were made directly to plaintiff.
If one thing is clear in this case, it is that the
trustees knew at all times what was going on and what plaintiff was
doing. It can be fairly held that the trustees approved of the
entire course of action taken by their mother. To argue as
defendant does is an attempt to cover up the basic facts with a
welter of legal technicalities. We find that the magistrate judge
was not clearly erroneous in his factual findings on standing and
we find no error of any dimension in his legal conclusions on this
issue.
III
We do have a problem with the damages award. Some
background facts are necessary. As already noted, the purchase and
sale agreement between the two corporations contained the following
provision under the title, Representations of the Seller:
J. Seller, to the best of its knowledge
and belief, is in full compliance with all
laws and regulations which apply to the
conduct of its business, including all laws
and regulations relating to employment.

Ex. 1, 7J.
There was unrebutted testimony by Gerald Felise, vice
president and chief financial officer of Douglass Corp., along the
following lines. Felise had extensive experience in the trucking
industry. The Department of Transportation has a long-standing
requirement mandating that truck drivers keep a record of all hours
spent "on duty" and "off duty." The time records must be kept in
what is called a log. It is the responsibility of the trucking
employer to see to it that the logs are accurate. The logs are
required to be kept at the terminal of origin and at the corporate
office. After he took over at Douglass Corp. in 1989, Felise
conducted an audit of the Appleyard Motor site in Metheun,
Massachusetts. He found that although the logs kept by the truck
drivers appeared to be in compliance with Department of
Transportation hour requirements, they did not check out with the
trip tickets issued at the points of origin and delivery. Trip
tickets are stamped with the time the truck leaves the terminal and
another ticket shows the time of delivery of the load. Unlike the
logs, the truckers had no control over the times stamped on trip
tickets. Appleyard Motor had a large percentage of independent
truckers hauling for it. Independent truckers own their own
tractors and lease containers furnished by the trucking company. 
It is to the financial advantage of independent truckers to carry
as many loads as possible, which may mean working more hours than
allowed by the Department of Transportation.
The magistrate judge relied on the testimony of Felise in
finding that "AMT's [Appleyard's] drivers were driving an excessive
number of hours and that AMT must have known this. This
constitutes a false representation or breach of warranty." This
finding was not clearly erroneous and insofar as it involved an
interpretation of paragraph 7J of the purchase and sale agreement,
it was not legal error.
Our difficulty with the damages award stems from the
magistrate judge's computation of damages. We quote the pertinent part of his opinion on damages:
Upon discovering that AMT's [Appleyard
Motor's] drivers had been driving excessive
hours, Gerald Felise, Vice President and Chief
Operating officer of JWD [Douglass Corp.],
issued a directive to the drivers to bring
their hours into compliance with the law. In
order to compensate the drivers for the loss
of driving time, AMT had to raise the rates it
charged its customers. This, in turn,
resulted in a loss of customers and a $300,000
annual decline in revenue associated with the
former AMT operation. (Tr. 1/16/67, at 113,
119, 135.) Starting from an annual revenue
base of $2.5 million, this amounts to a 12%
decline. Although Douglas [sic] presented no
evidence that purported to address directly
the issue of damages or even to quantify JWD's
loss in profits as a result of this decline in
revenue, I infer that, if JWD had known that
annual revenue from the AMT operation would
decline 12% as a result of JWD having to bring
that operation into compliance with law, the
fair price JWD would have been willing to pay
for AMT would have been at least 12% (or
$96,000) below the $800,000 it agreed to pay. 
On this basis, I find that the difference
between the value of the assets as represented
or warranted and their actual value was at
least $96,000.

As of November 1989 when JWD ceased making
payments, the principal balance due on the
note before any offset was approximately
$217,644. (Ex. 2.) Giving Douglas credit for
the $96,000 offset to which he is minimally
entitled, the principal amount outstanding
must be reduced to $121,644. As of November
1994, Appleyard calculated that approximately
$151,644 was due in interest and late charges,
based on the assumption that the principal
balance outstanding was $217,644. (Id.) 
Extrapolating, I find that the amount of
interest and late charges that was due as of
November 1994 on the adjusted principal
balance of $121,644 was approximately $84,626
($121,644 divided by $217,644 equals 55.89%,
55.89% of $151,412 equals $84,626). 
Accordingly, I find that, as of November 1994,
Douglas owed Appleyard a total of $206,270
($121,644 plus $84,626).

We note first that the statement by the magistrate judge
that "Douglas presented no evidence that purported to address
directly the issue of damages or even to quantify JWD's loss in
profits as a result of this decline in revenue" is contrary to the
record. Gerard Felise, vice president and chief financial officer
of Douglass, testified directly on this. His testimony can be
summarized as follows.
Appleyard Motor's operations at the Methuen,
Massachusetts, site grossed $2.5 million annually. Its operating
cost was .87 cents on the dollar; this meant that its profit was
.13 cents on the dollar. This translated into roughly between
$200,000.00 and $400,000.00 worth of cash flow profits annually. 
In order to operate in compliance with the Department of
Transportation's hourly requirements the rates charged customers
were increased by 18%. The customers refused to pay the additional
18%. This resulted in a "negative revenue stream" of $300,000.00,
or to put it another way, there was a $300,000.00 annualized
decline in revenue based on a $2.5 million starting point. This
contributed to an overall decline in revenue of 40% for Douglass
Corp. The result was the filing of a chapter 11 petition in
bankruptcy by Douglass Corp. on January 27, 1990. In answer to a
question by the magistrate judge, Felise stated the $300,000.00
loss in annual revenue was due solely to the mandatory compliance
with the reduced hours required by the Department of
Transportation. (The magistrate judge did not question the
credibility of Felise; indeed, he relied on his testimony in
finding a false representation by Appleyard Motor.)
There was also testimony by Michael Pierce, accountant
for Appleyard Motor, that prior to the sale of its assets its
profits were $200,000.00-$300,000.00 a year. Thus, it appears from
the evidence that the entire profit margin of Appleyard Motor was
wiped out when the driving hours violation was corrected.
We are also bothered by the magistrate judge's statement
that if Douglass Corp. had known that the annual revenue from the
Appleyard Motor operation would decline 12% because customer rates
had to be raised 18% to bring the operation into compliance with
the law, "the fair price JWD [Douglass] would have been willing to
pay for AMT [Appleyard] would have been at least 12% (or
$96,000.00) below the $800,000.00 it agreed to pay."
There is no evidentiary basis for such an inference. 
There was no testimony as to what a willing buyer would have paid
a willing seller under these circumstances. Moreover, the
magistrate judge gave no consideration to the inescapable fact that
a reduction of $300,000.00 in annual earnings effectively
eliminated Appleyard Motor's profits. We cannot conjecture without
evidence what Douglass Corp. would have paid if the hour violations
had been brought to its attention prior to the sale. Douglass may
well have decided not to purchase Appleyard Motor.
There is one thing, however, that has been established
beyond peradventure. The hours violations resulted directly in an
annual loss of revenue to Douglass Corp. of $300,000.00. The
offset provision in the note and purchase and sale agreement
states:
The obligation evidenced by this Promissory
Note is at all times subject to the terms and
conditions of that certain Asset Purchase
Agreement dated November 28, 1988, which is
hereby incorporated by reference and any other
agreements related thereto and the Borrower is
expressly granted the right to offset against
any and all sums payable to Noteholder by
Borrower under this Note in an amount equal to
any and all losses, claims, and/or damages
sustained by Borrower resulting from the
assertion of a debt, claim or liability
brought against Borrower which had not been
previously disclosed by Noteholder or as a
result of any failure or breach of any
warranty or representation by Noteholder or
any misrepresentation made by Noteholder in
connection with the sale of the Assets.

While a trial court generally has considerable discretion
in fixing damages, such an award must yield when there is "clear
error." La Esperanza de P.R., Inc. v. Perez y Cia. de P.R., Inc.,
124 F.3d 10, 21 (1st Cir. 1997). We think that is the case here. 
The district court clearly erred when it inferred that Douglass
Corp. would have paid only 12% less for Appleyard Motor in the
total absence of any evidence to that effect. Quabaug Rubber Co.v. Fabiano Shoe Co., 567 F.2d 154, 162 (1st Cir. 1977)(damage award
"not supported by substantial evidence . . . was in error"); cf.Kaiser Aluminum & Chemical Corp. v. Bonjorno, 494 U.S. 827, 836
(1990). This is especially so in light of the fact that bringing
Appleyard Motor into compliance with Department of Transportation
requirements obliterated the profit margin of the purchased entity. 
And the court did not make any "conclusions of law from which a
theory of damages that would support the award[] can be inferred." 
Westminster Elec. Corp. v. Salem Eng'g & Const., 712 F.2d 720, 724
(1st Cir. 1983)). 
Douglass Corp. was entitled under the note "to offset
against any and all sums payable to Noteholder . . . in an amount
equal to any and all losses, claims, and/or damages sustained by
Borrower resulting from . . . any failure or breach of any warranty
or representation." We fail to understand, in the absence of
evidence, how the 12% purchase price reduction suffices to offset
the actual effect of Appleyard Motor's misrepresentation.
We must, therefore, vacate the award of damages and
remand solely for a new determination of damages. So Ordered. No
costs to either party.