In the Matter of the COMPLAINT OF Philip R. MARTIN, Petitioner, As Owner of the 42′ 1989 Chris Craft, 427 Catalina Double Cabin, Pleasure Vessel, Tranquility, USCG Doc. No. 1109120, For Exoneration from or Limitation of Liability.

Civil Action No. 07–11079–RBC.

United States District Court,
D. Massachusetts.

Feb. 9, 2009.

John David Blaisdell, Robert E. Kiely, Regan & Kiely, LLP, Brian Keane, Kaplan/Bond Group, Boston, MA, for Philip R. Martin.

Thomas J. Conroy, Law Offices of Thomas J. Conroy & Associates, Cambridge, MA, for Anthony Arnone.

David J. Farrell, Jr., Law Office of David J. Farrell, Jr., Chatham, MA, for Metropolitan Yacht Club, Inc.

Steven E. Kramer, Wellesley Law Associates, Wellesley, MA, pro se.

Steven E. Kramer, Wellesley Law Associates, Wellesley, MA, for Donald Salvucci.

## MEMORANDUM AND ORDER ON DEFENDANT METROPOLITAN YACHT CLUB, INC.'S MOTION FOR SUMMARY JUDGMENT (# 48)

COLLINGS, United States Magistrate Judge.

### I. Introduction

On June 8, 2007, Philip R. Martin ("Mr. Martin") petitioned this Court for exonera-

tion from or limitation of liability relating to a fire on November 17, 2006, at the Metropolitan Yacht Club ("MYC") that damaged Mr. Martin's pleasure vessel, TRANQUILITY, as well as other MYC members' vessels. (# 1 ¶¶ 2, 5) Mr. Martin's Petition, pursuant to the Limitation of Liability Act, 46 U.S.C. §§ 30501 *et seq.*, spawned a landslide of claims, counterclaims, and crossclaims involving MYC, the boat owners whose vessels were damaged as a result of the fire, and the subrogees of the boat owners (collectively, all parties arguing on behalf of the boat owners will be herein identified as "the boat owners"). (## 9, 10, 12–14)

In partial chronological order, the pleadings were filed as follows: Donald Salvucci ("Mr. Salvucci") filed a claim and answer on September 25, 2007, alleging that the fire occurred as a result of Mr. Martin's negligence and denying that Mr. Martin is entitled either to exoneration or limitation of liability.[1] (# 9) On September 27, 2007, MYC filed its answer denying that Mr. Martin had no knowledge or privity of the fire and denying that Mr. Martin is entitled to exoneration from or limitation of liability; affirmative defenses alleging that the fire was caused by parties other than MYC, specifically Mr. Martin's negligence; and a claim for relief attributing liability for the fire to Mr. Martin and seeking indemnification and/or contribution from him for losses incurred by MYC.[2] (# 12)

On September 28, 2007, Anthony and Dianne Arnone ("Mr. or Mrs. Arnone")

filed a claim and answer alleging that the fire occurred as a result of the negligence of Mr. Martin and/or Mr. Salvucci and/or MYC and denying that Mr. Martin, or others, are entitled either to exoneration or limitation of liability. (# 14) On October 16, 2007, Mr. Martin answered MYC's claims and set forth affirmative defenses alleging that the fire was caused by MYC's negligence and/or breach of contract. (# 16)[3]

On October 31, 2007, Travelers Insurance Company ("TIC") filed a motion to intervene as subrogee of Mr. Martin as owner of the vessel, TRANQUILITY, and Mr. Salvucci as owner of the vessel, OMNI, along with a memorandum of law in support thereof and a complaint against MYC.[4] (# 22) MYC answered TIC's complaint and interposed affirmative defenses on December 17, 2007.(# 33) On the same date MYC also answered Mr. Salvucci's complaint, raised affirmative defenses, and alleged a counterclaim against him. (# 34) Four days later on December 21, 2007, Mr. Salvucci answered MYC's counterclaim and raised affirmative defenses to it. (# 37) On January 10, 2008, MYC filed an answer and affirmative defenses to Mr. and Mrs. Arnone's claim. (# 38)

On January 24, 2008, International Marine Underwriters ("IMU") filed a motion to intervene as subrogee of Frances Maloney ("Mr. Maloney") as owner of the vessel, NON CENTS, and Margaret and Richard Young ("Mr. or Mrs. Young") as owners of the vessel, TEACHER'S PET,

---

1. On November 26, 2007, Mr. Salvucci filed a three-count crossclaim alleging negligence, breach of contract and breach of bailment against MYC. (# 28)

2. On January 29, 2008, MYC filed an assented-to motion to amend its answer and claim (# 41) which motion was granted the same day.

3. On October 17, 2007, this case was referred to the undersigned for full pretrial case management not including dispositive motions. (# 19) With the parties' consent, on November 27, 2007 the case was reassigned to the undersigned for all purposes, including trial and the entry of judgment. (# 31)

4. This motion was allowed on February 6, 2008.

(# 39) along with a memorandum of law in support and a complaint against MYC.[5] (# 40) On January 29, 2008, MYC answered IMU's petition and asserted affirmative defenses. (# 42)

On January 30, 2008, Mr. and Mrs. Arnone filed an amended crossclaim against MYC. (# 43) MYC filed an answer and affirmative defenses to Mr. and Mrs. Arnone's amended crossclaim on March 6, 2008.(# 46)

On April 29, 2008, MYC filed a motion for summary judgment (# 48) with twenty-two exhibits [6], an affidavit (# 49) and a memorandum of law in support. (# 50) The summary judgment motion seeks disposition of the claims asserted against MYC by TIC, Mr. Salvucci, Mr. and Mrs. Arnone and IMU. On May 20, 21, and 22, 2008, Mr. Salvucci, Mr. and Mrs. Arnone, and TIC/IMU respectively filed oppositions to MYC's motion for summary judgment with supporting statements of material fact and memoranda of law. (## 53–59) At this juncture, the record is complete and the motion for summary judgment stands ready to be decided.

## II. Factual Background

On November 17, 2006 at approximately 4:52 a.m. there was an accidental fire at the MYC. (# 59, Exh. 22) The fire destroyed two yachts, TRANQUILITY and THE OMNI, causing them to sink. (# 59, Exh. 22) Eight other boats were damaged by the fire. (# 54, Exh. 22) Pertinent to this lawsuit, the following members' vessels sustained damage as a result of the November 17, 2006 fire while they were stored in the water for the winter at MYC: Mr. Martin's TRANQUILITY, Mr. Salvucci's THE OMNI, Mr. and Mrs. Arnone's LADY–DY, Mr. Maloney's NON–CENTS, and Mr. and Mrs. Young's TEACHER'S PET. (# 50 ¶ 10; # 59 ¶ 10)

The Massachusetts State Police Fire and Explosion Section conducted an investigation into the cause of the fire starting November 17, 2006 and ending approximately December 1, 2006, and then compiled a report from this investigation. (# 59, Exh. 22) The investigator opined that the most probable cause of the fire was "the result of electrical arcing in the wiring located beneath the surface of the finger dock." (# 59, Exh. 22)

Upon joining the MYC, a non-profit organization, all members—including the parties in this case—filled out and signed a membership application. (# 48, Exh. 2–6; # 50 ¶ 6; # 59 ¶ 6) Above the signature line, the membership application states that "I agree if accepted, to abide to (sic) the By-laws and Rules of the Club." (# 48, Exh. 2–6) The members pay an initiation fee and club dues according to the By-Laws. (# 48, Exh. 1, Art. XVII, XXI)

The members of MYC may apply to store their boats on the Club premises throughout the year. (# 48, Exh. 1, Dock and Float Rules) In 2006 "[w]inter storage season [ran] from November 1 to March 31. Summer season [ran] from April 1 to October 31...." (# 48, Exh. 1, Dock and Float Rules § 5) A summer slip costs $40 per linear foot according to the Slip Application. (# 48, Exh. 7–11B) Winter storage costs $24 per linear foot for dry storage and $14 per linear foot for wet storage according to the Winter Storage Application. (# 48, Exh. 12–16) Other fees and costs are associated with the storage but

---

5. This motion was allowed on the day it was filed.

6. As originally filed, the exhibits numbered fifty. However, on May 5, 2008, MYC refiled

certain of the multipart documents as single documents. (# 51) For the sake of clarity, the exhibits shall be designated as MYC references them in the text of its motion (# 48).

they are not material to this dispute. (# 48, Exh. 12–16) The Dock and Float Rules provide that "[b]oat owners assume all risks of any damage incurred during the storage period." (# 48, Exh. 1, Dock and Float Rules § 5) The members have free access to their boats while stored at MYC. (Young: # 48, Exh. 18 at 27:10–28:6, 30:12–31:8; Maloney: # 48, Exh. 19 at 15:13–16:11, 22:1–13, 37:18–21; Arnone: # 48, Exh. 20 at 33:1–21; Salvucci: # 48, Exh. 21 at 47:18–51:8; Martin: # 48, Exh. 22 at 9:7–10:3, 28:3–29:18)

On the 2006 Slip Application, a clause located directly above the signature line reads, "The owner/master further acknowledges that these provisions are in addition to the Dock & Float Rules and the Bylaws of Metropolitan Yacht Club, which the owner/master hereby ratifies and confirms." (# 48, Exh. 7–11B) There is no comparable clause on the Winter Storage Application. (# 48, Exh. 12–16)

Article XXIII of the By–Laws provides for MYC's limitation of liability. (# 48, Exh. 1, Art. XXIII) Specifically, Section 2 states that:

> The Club expressly absolves itself and its servants, agents, and employees and each member agrees that the Club may absolve itself from any liability for damages to any boat, property, appurtenances and contents thereof, or for damages to any property of each member or anyone upon Club premises under right or privilege of each member. Club premises shall include but not [be] limited to docks, floats, storage, and lift facilities for said boats. Said absolution from liability shall include but not be limited to: (a) Fire; (b) Theft; (c) Vandalism; (d) Water damage; (e) Negligent acts or omissions.

Motion For Summary Judgment # 48, Exh. 1, Art. XXIII § 2.

The By–Laws and Club rules contain other liability-limiting language. For example, in the Dock and Float Rules, Section 5 states that "[b] oat owners assume all risks of any damage incurred during the storage period." (# 48, Exh. 1, Dock and Float Rules § 5) Further, the By–Laws also provide that

> [t]he Club shall not be liable to the boat owner or those claiming by and through him for any loss or damage to his property or person, or to the property or person of his employees, agents and guests, and servants resulting from any breach of any contract, agreement, or work order.

Motion For Summary Judgment # 48, Exh. 1, Art. XXIII § 6.

The members are "supposed to" get a copy of the By–Laws "[w]hen you join the club." (# 48, Exh. 18 at 9:17–10:9) Although not everyone gets a copy immediately after they join, "if you have a boat there, you'd have an opportunity to go into the . . . clubhouse and pick one up." (# 48, Exh. 18 at 10:4–9) Many members received a copy of the By–Laws by the time they attended their first member meeting, as was the case with Mr. Young, while Mr. Maloney believed he received a copy upon officially becoming a member. (# 48, Exh. 18 at 47:11–17; Exh. 19 at 44:3–9) In the case of Mr. and Mrs. Arnone, they did not receive a copy until approximately nine months after signing the membership application. (# 48, Exh. 20 at 106:18–24) Mr. Salvucci obtained a copy of the By–Laws one year after he joined and every year thereafter. (# 48, Exh. 21 at 37:7–14) Mr. Martin possessed and read the By–Laws prior to the date of the fire. (# 48, Exh. 22 at 11:15–12:24)

The By–Laws may be amended by a two-thirds vote of the members present at a meeting conducted under Robert's Rules of Procedure. (# 50 ¶ 6; # 59 ¶ 6) All of

the members at issue in the instant case have attended a membership meeting prior to the fire and were aware that the By-Laws could be amended. (Young: # 48, Exh. 18 at 11:17–12:6, 71:19–73:15; Maloney: # 48, Exh. 19 at 14:7–24, 68:1–69:24; Arnone: # 48, Exh. 20 at 27:9–28:25, 68:12–17; Salvucci: # 48, Exh. 21 at 17:10–21, 19:19–20:5; Martin: # 48, Exh. 22 at 30:24–31:10)

According to Richard H. Kream, a long-time member of the club, the MYC has reimbursed members for minor damages—less than $500—incurred when the travel lift hauled the vessel out of the water for the winter or launched it in the spring. (# 49¶ ¶ 1, 4–6) The By–Laws provide that the Board of Trustees has "the authority to incur any expense not included in the approved budget in an amount not to exceed $5,000.00 and shall report such expense at the next regular meeting of the Club." (# 48, Exh. 1, Art. XII § 3) Mr. Kream averred that such payments were to be considered "gifts made to individual members in the interests of expediency and good will rather than admissions of any responsibility by the club." (# 49¶ 6)

### III. Summary Judgment Standard of Review

The purpose of summary judgment " 'is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.' " *Rojas–Ithier v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de Puerto Rico*, 394 F.3d 40, 42 (1st Cir.2005) (quoting *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir.1992), *cert. denied*, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993)); *see also Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990). The party moving for summary judgment bears the initial burden of asserting the absence of a genuine issue of material fact and "support[ing] that asser-

tion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top–Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir.2003); *De La Vega v. San Juan Star, Inc.*, 377 F.3d 111, 115–16 (1st Cir.2004). " 'Once the moving party avers the absence of genuine issues of material fact, the nonmovant must show, through materials of evidentiary quality, that such a dispute exists.' " *Cordero–Soto v. Island Finance, Inc.*, 418 F.3d 114, 119 (1st Cir. 2005) (quoting *Rathbun v. Autozone, Inc.*, 361 F.3d 62, 66 (1st Cir.2004)); *see also Mulvihill*, 335 F.3d at 19 (citing *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir.2000)).

When considering whether to grant summary judgment, the Court must determine whether " . . . the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court looks to "the record on summary judgment in the light most favorable to the nonmovant." *Hoffman v. Applicators Sales and Service, Inc.*, 439 F.3d 9, 11 (1st Cir.2006) (citing *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 50 (1st Cir.2000)). All reasonable inferences will be drawn in the favor of the nonmoving party. *Poulis–Minott v. Smith*, 388 F.3d 354, 361 (1st Cir.2004); *see also Alliance of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 34 (1st Cir.2005), *cert. denied*, 547 U.S. 1143, 126 S.Ct. 2034, 164 L.Ed.2d 806 (2006); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir.2004); *Mulvihill*, 335 F.3d at 19; *Podiatrist Ass'n, Inc. v. La Cruz Azul de Puerto Rico, Inc.*, 332 F.3d 6, 13 (1st Cir.2003).

Despite this "notoriously liberal" standard, *Mulvihill*, 335 F.3d at 19, summary judgment cannot be construed as "a hollow threat". *Kearney v. Town of Ware-*

*ham,* 316 F.3d 18, 22 (1st Cir.2002). A factual dispute which is neither "genuine" nor "material" will not survive a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "An issue is 'genuine' for purposes of summary judgment if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Poulis–Minott,* 388 F.3d at 362–63 (quoting *Hayes v. Douglas Dynamics, Inc.,* 8 F.3d 88, 90 (1st Cir. 1993), *cert. denied,* 511 U.S. 1126, 114 S.Ct. 2133, 128 L.Ed.2d 863 (1994)); *Rojas–Ithier,* 394 F.3d at 42; *Calero–Cerezo v. U.S. Dep't of Justice,* 355 F.3d 6, 19 (1st Cir. 2004). Mere speculations raised by the nonmoving party that are unsubstantiated will not be sufficient to defeat summary judgment. *Nieves–Luciano v. Hernandez–Torres,* 397 F.3d 1, 5 (1st Cir.2005).

In weighing whether a factual dispute is "material," the Court must examine the substantive law of the case because "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *De La Vega,* 377 F.3d at 115; *Rojas–Ithier,* 394 F.3d at 42.

The focus at the summary judgment phase "should be on the ultimate issue: whether, viewing the aggregate package of proof offered by the plaintiff and taking all inferences in the plaintiff's favor, the plaintiff has raised a genuine issue of fact.'" *Rivas Rosado v. Radio Shack, Inc.,* 312 F.3d 532, 535 (1st Cir. 2002) (quoting *Dominguez–Cruz v. Suttle Caribe, Inc.,* 202 F.3d 424, 430–31 (1st Cir.2000)); *see also Nieves–Luciano,* 397 F.3d at 4; *Rojas–Ithier,* 394 F.3d at 42. The party objecting to summary judgment must set forth specific facts proving a genuine issue of material fact in order to

"'deflect the swing of the summary judgment scythe.'" *Noviello v. City of Boston,* 398 F.3d 76, 84 (1st Cir.2005) (quoting *Mulvihill,* 335 F.3d at 19). Where "the non-moving party rests 'merely upon conclusory allegations, improbable inferences, and unsupported speculation,'" summary judgment will be appropriate. *Forestier Fradera v. Municipality of Mayaguez,* 440 F.3d 17, 21 (1st Cir.2006) (quoting *Benoit v. Technical Mfg. Corp.,* 331 F.3d 166, 173 (1st Cir.2003) (further internal citations omitted)). Moreover, the party objecting to summary judgment may not rest "merely on allegations or denials in [their] own pleading." Fed.R.Civ.P. 56(e)(2); *Ramirez Rodriguez v. Boehringer Ingelheim Pharmaceuticals, Inc.,* 425 F.3d 67, 83 (1st Cir.2005). Instead, Rule 56(c):

> mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## IV. Discussion

### A. Admiralty Jurisdiction

The parties agree that the issue at hand falls under the purview of admiralty jurisdiction, and "[w]ith admiralty jurisdiction comes the application of substantive admiralty law." *East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 864, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). *See also La Esperanza de P.R., Inc. v. Perez y Cia. de Puerto Rico, Inc.,* 124 F.3d 10, 16 (1st Cir.1997) ("We address the parties' various claims under federal maritime law because '[a]dmiralty jurisdiction brings with it a body of federal jurisprudence, largely uncodified, known as mari-

time law.' ") (quoting *In re Ballard Shipping Co. v. Beach Shellfish,* 32 F.3d 623, 625 (1st Cir.1994)). The parties disagree, however, about the applicability of certain state court decisions with the boat owners arguing there is no need to resort to state law given the abundance of admiralty cases on the subject of exculpatory clauses while MYC contends that the Court should consider state law where (and if) there is no admiralty law directly on point.

 The rule is that "[a]bsent a relevant statute, the general maritime law, as developed by the judiciary, applies. Drawn from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules." *East River S.S. Corp.,* 476 U.S. at 864–865, 106 S.Ct. 2295 (citations and footnote omitted). "Although a court sitting in admiralty jurisdiction must apply federal maritime rules that directly address the issues at hand, it may—and should—resort to state law when no federal rule covers a particular situation." *Greenly v. Mariner Management Group, Inc.,* 192 F.3d 22, 25–26 (1st Cir.1999) (citations omitted); *Persson v. Scotia Prince Cruises, Ltd.,* 330 F.3d 28, 32 (1st Cir.2003) (" 'State law may supplement maritime law where maritime law is silent . . ., but state law may not be applied where it is materially different than maritime law, or where it would defeat the reasonably settled expectations of maritime actors.' ") (quoting *Windsor Mount Joy Mut. Ins. Co. v. Giragosian,* 57 F.3d 50, 54 (1st Cir.1995)); *Acadia Ins. Co. v. McNeil,* 116 F.3d 599, 603 (1st Cir. 1997). Thus, except where materially different, state law may fill in the gaps where there is no admiralty law directly on point.

### B. Validity of the Exculpatory Clause

In 1955, the United States Supreme Court attempted to settle uncertainty among the federal courts by addressing the issue of whether a towboat could contract against all liability for its own negligent towage. *Bisso v. Inland Waterways Corp.,* 349 U.S. 85, 85–86, 75 S.Ct. 629, 99 L.Ed. 911 (1955) (discussing the earlier Supreme Court decision, *The Steamer Syracuse,* 12 Wall. 167, 20 L.Ed. 382 (1871), which invalidated a purely "tow at own risk" contract clause). The Court adopted the judicial rule that "contracts releasing towers from all liability for their negligence" are invalid. *Bisso,* 349 U.S. at 90, 75 S.Ct. 629 (footnote omitted). Two reasons were given for this rule: "(1) to discourage negligence by making wrongdoers pay damages, and (2) to protect those in need of goods or services from being overreached by others who have power to drive hard bargains." *Bisso,* 349 U.S. at 91, 75 S.Ct. 629 (footnote omitted).

The First Circuit, sitting in admiralty jurisdiction, affirmed the validity of a "red letter clause" in *La Esperanza de P.R., Inc. v. Perez y Cia. de Puerto Rico, Inc.,* 124 F.3d 10, 19 (1st Cir.1997). Citing *Bisso,* the First Circuit stated that "[w]hile exculpatory clauses-commonly referred to as red letter clauses—were traditionally disfavored by courts sitting in admiralty, . . . such clauses are today routinely enforceable." *La Esperanza,* 124 F.3d at 19 (also *quoting East River S.S. Corp.,* 476 U.S. at 873, 106 S.Ct. 2295, for the proposition "that a marine contractor 'can restrict its liability *within limits* by disclaiming warranties or limiting remedies.' "). In *La Esperanza,* a ship owner and shipyard brought actions against each other alleging negligence and breach of contract as well as unpaid work pursuant to contract, respectively. *La Esperanza,* 124 F.3d at 12. The rule, as laid out by *La Esperanza,* was that "courts today will enforce red letter clauses that are expressed clearly in contracts entered into freely by parties of

equal bargaining power, provided that the clause not provide for a total absolution of liability." *La Esperanza*, 124 F.3d at 19 (citations omitted).

The shipyard's "contract unambiguously provid [ed] that '[t]he yard shall in no case be held responsible for the damages resulting from any loss of use or profit of the vessel.'" *La Esperanza*, 124 F.3d at 20 (quoting the contract) (footnote omitted). The Court held that the shipyard was negligent, but not grossly negligent, and therefore in violation of the red letter clause. *La Esperanza*, 124 F.3d at 19. "The rationale for upholding such clauses, so long as no overreaching is found, ... is predicated upon the consideration that businessmen can bargain over which party is to bear the risk of damage and set the price accordingly, thus achieving a more rational distribution of the risk [and allocation of price] than the law would otherwise allow." *La Esperanza*, 124 F.3d at 19 (internal quotations and citations omitted). Further, "[a] red letter clause, finally, may not limit liability on a marine contract for gross negligence because ' "harm wilfully inflicted or caused by gross or wanton negligence," ' operates to 'invalidate an exemption from liability.'" *La Esperanza*, 124 F.3d at 19 (quoting *Todd Shipyards Corp. v. Turbine Service, Inc.*, 674 F.2d 401, 411 (5th Cir.)), *cert. denied sub nom. Sentry Insurance v. Todd Shipyards Corp.*, 459 U.S. 1036, 103 S.Ct. 447, 74 L.Ed.2d 602 (1982) (quoting 6A Corbin On Contracts § 1472 (1964 ed.)). In other words, had the Court found gross negli-

gence, the red letter clause would have been unenforceable as a limitation of the ship owner's recovery for "loss of the vessel's use and loss of profit" because "parties may not totally absolve themselves of all liability." *La Esperanza*, 124 F.3d at 19.

The First Circuit's decision in *La Esperanza* has been met with criticism. *See Broadley v. Mashpee Neck Marina, Inc.*, 471 F.3d 272, 274–5 (1st Cir.2006) (holding that *La Esperanza* "cannot control" in a personal injury suit where an exculpatory clause did not specifically reference negligence and was "vastly overbroad and against public policy insofar as it purports to absolve Marina of liability for gross negligence, recklessness and intentional wrongdoing" [7]) (footnote omitted). Circuit courts are split on this issue. The Fifth, Eighth, and Ninth Circuits have upheld "exculpatory clauses that fully exonerate a party from liability for its own negligence ..." *See Sander v. Alexander Richardson Investments*, 334 F.3d 712, 714, 721 (8th Cir.2003) ("We hold that the exculpatory clause contained in the slip rental agreements is valid and enforceable. The agreement clearly and unequivocally shifted the risk of loss to the boat owner and released the Yacht Club from all liability, including that liability arising from its own negligence. Public policy demands enforcing contracts as written and recognizing the parties' freedom to contract."); *Royal Ins. Co. of America v. Southwest Marine*, 194 F.3d 1009, 1014 (9th Cir.1999) ("[E]x-

---

7. The *Broadley* exculpatory clause read:

The OWNER [Broadley] warrants and [covenants] that ... the OWNER ... will [not] make any claims, demands, causes of action of any kind and nature, or obtain or enforce any judgments, executions or levies thereon ... against MARINA, its officers, directors, agents, servants, or its employees, arising out of any damage, loss, personal injury or death suffered by [him].... The OWNER ... agree[s] and covenant[s] that [he] will defend, indemnify and save MARINA harmless from any and all of such claims, demands, causes of action, judgments and executions, and the MARINA shall be entitled to responsible attorneys fees in the event of breach of the OWNER's covenant hereunder.

*Broadley*, 471 F.3d at 273.

cept in towing contracts, exculpatory clauses are enforceable even when they completely absolve parties from liability for negligence.") (citations and footnote omitted); *Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 540 (5th Cir.1986) (upholding an exculpatory clause for a party's own negligence in an indemnification scenario). The Eleventh Circuit, siding with the First Circuit pre-*Broadley*, has held that an exculpatory clause does not fully absolve a party from their own negligence. *Diesel "Repower", Inc. v. Islander Investments Ltd.*, 271 F.3d 1318, 1324 (11th Cir.2001) (A "limited liability clause ... must not absolve the repairer of all liability and must still provide a deterrent to negligence.").

Notably, *Broadley* held that the language in *La Esperanza* stating that an exculpation clause is valid "provided that the clause not provide for a total absolution of liability," *La Esperanza*, 124 F.3d at 19, was "dicta." *Broadley*, 471 F.3d at 274. The First Circuit stated "the better rule" to be "that an exculpatory clause limited to barring liability for ordinary negligence would be valid, assuming it were not inflicted by a monopolist or one with greatly superior bargaining power." *Broadley*, 471 F.3d at 274. That is, the First Circuit in *Broadley* disavowed any notion that exculpatory clauses in marine contracts cannot ever "provide for a total absolution of liability," *Broadley*, 471 F.3d at 274 (quoting *La Esperanza*, 124 F.3d at 19), and said that "an admiralty rule, flatly preventing parties from contracting away claims for simple negligence in all circumstances, would be surprising." *Broadley*, 471 F.3d at 274. Essentially, the *Broadley* court held that a party may contract away claims for simple negligence under all circumstances if the clause is valid. *Broadley*, 471 F.3d at 274. Testing the validity of the exculpatory clause requires application of doctrines such as "unconscionability and contracts of adhesion—turning on factors like adequate disclosure, relative bargaining power and the like." *Broadley*, 471 F.3d at 274 (citation omitted).

■ Under *Broadley*'s "better rule," the first question to ask is whether the "exculpatory clause [was] limited to barring liability for ordinary negligence." *Broadley*, 471 F.3d at 274. If the clause in question is so limited, then the second part of the inquiry is to ensure that "it [was] not inflicted by a monopolist or one with greatly superior bargaining power." *Broadley*, 471 F.3d at 274. If the answer to both of those questions is in the affirmative, then the inquiry stops and the clause is valid. However, if either of the answers is in the negative, then the clause, as is, is invalid.

■ Only simple negligence is alleged in this case. The exculpatory clause in MYC's By–Laws does specify that MYC shall be absolved from liability emanating from "[n]egligent acts or omissions." (# 48, Exh. 1, Art. XXIII § 2) However, in light of the broad language in which the MYC clause is drafted, this is not the type of "ordinary negligence" that *Broadley* instructs may be avoided. Preceding the mention of "[n]egligent acts or omissions," the clause provides that "[s]aid absolution from liability shall include but not be limited to." (# 48, Exh. 1, Art. XXIII § 2) Further, the clause contains such phrases as "*any* liability." (# 48, Exh. 1, Art. XXIII § 2) (emphasis added). As written, the clause at issue covers more than just simple negligence and, consequently, is invalid on its face under the *Broadley* rule.

■ The MYC red letter clause does pass muster under the second part of the *Broadley* test—that is, to ensure that the contract in question was "not inflicted by a monopolist or one with greatly superior bargaining power." *Broadley*, 471 F.3d at

274 ("Broadley does not claim that Marina had undue bargaining power—presumably because there are alternative marinas in the general area [.]"). In this case the boat owners admit that there is "availability of summer dockage and/or winter storage in the general area of [MYC]." (# 50 ¶ 4; # 59 ¶ 4) Thus, "there was nothing preventing the boat owners from ... refusing to enter into the contract and docking, mooring, or otherwise keeping their vessels at some other location." *In re Stanton*, 2005 WL 2035586, at *8 (D.Mass. Aug. 18, 2005) (citations omitted). Because there were other options for docking or storing boats available to the members of the MYC, the contract was not inflicted by a monopolist or one with unequal bargaining power.

 Having concluded that the exculpatory clause is invalid due to overbreadth, the Court *may* "sever or divide provisions that are unlawful as written, retaining those provisions or applications of them that are permissible." *See Broadley*, 471 F.3d at 275 (applying 2 *Farnsworth on Contracts* § 5.8 and Restatement (Second) of Contracts § 184 because "[s]tate law is not uniform" on this issue). The Restatement specifically provides that "[a] court *may* treat only part of a term as unenforceable ... if the party who seeks to enforce the term obtained it in good faith and in accordance with *reasonable standards of fair dealing*." Restatement (Second) of Contracts § 184 (emphasis in original). In determining whether to narrow the clause, the relevant factors to consider are the level of "overbreadth of the clause and the plainness of its illegality, the boilerplate character of the contract[,] lack of specific negotiation, the absence of an explicit reference to negligence[,] ... and [the presence of an] attorney's fees clause...." *Broadley*, 471 F.3d at 276. The validity of the red letter

clause at hand shall be evaluated pursuant to these criteria, bearing in mind the First Circuit's observation that "we are dealing with poorly developed and confusing admiralty law." *Broadley*, 471 F.3d at 277.

*1. Overbreadth and the Plainness of its Illegality*

 While the exculpatory clause in MYC's By–Laws is perhaps not "extremely overbroad," as was the clause in *Broadley*, a certain degree of overbreadth is manifested in phrases like *"any* liability" and "absolution from liability shall include *but not be limited to.*" (# 48, Exh. 1, Art. XXIII § 2) (emphasis added). Despite this expansive language, MYC's exculpatory clause details instances in which the Club was to be absolved from liability— "[s]aid absolution from liability shall include but not be limited to: (a) Fire; (b) Theft; (c) Vandalism; (d) Water damage; (e) Negligent acts or omissions." (# 48, Exh. 1, Art. XXIII § 2) Unlike the situation in *Broadley*, this language is clear, specific and quite "likely to convey an *effective* warning to the reader." *See Broadley*, 471 F.3d at 275 (emphasis in original).

While the subject of exculpatory clauses in general has been developed in admiralty law, the parties have not cited any admiralty cases addressing exculpatory clauses incorporating specific limitations. Consequently the Court shall look to state law for guidance. The Massachusetts Appeals Court held that a golf club was entitled to summary judgment against the estate of a member who died in an accident while driving a golf cart. *Post v. Belmont Country Club, Inc.*, 60 Mass.App.Ct. 645, 805 N.E.2d 63 (2004), *rev. denied*, 442 Mass. 1102, 809 N.E.2d 1061 (2004) (Table). That Court, upholding the Club's exculpatory clause, stated that the member "was bound by the release and indemnity clause,

even though ... it was contained in a member's handbook among many other rules." *Post,* 60 Mass.App.Ct. at 647, 805 N.E.2d at 67.

The *Post* exculpatory clause is instructive because it details specific circumstances to which the exculpatory clause applies similar to the MYC clause. *Compare Post,* 60 Mass.App.Ct. at 646, 805 N.E.2d at 66 (citing to the clause which uses phrases such as "[e]ach person using a cart," "[e]ach person renting or driving a cart," and "injury to him/herself and damage to the cart") *with Broadley,* 471 F.3d at 273 (showing a lack of specific circumstances in which liability is limited). Therefore, MYC's clause-insofar as it lists specific examples—is not invalid due to overbreadth.

The boat owners attempt to distinguish the *Post* case by arguing that the exculpatory clause in that case related to a very narrow, particular and well-defined activity, the use of a golf cart. (# 59 at 28) This contention is not persuasive. Not only are the *Post* and MYC clauses comparable in light of their specific applications, they are similar with respect to their expansive language as well. For example, the MYC By–Laws state that "[t]he Club expressly absolves itself ... from *any* liability ... or for damages to *any* property...." (# 48, Exh. 1, Art. XXIII § 2) (emphasis added) whereas the *Post* exculpatory clause states that "[e]ach person renting or driving a cart is responsible for *any* personal injury or property damage caused ... and agrees to indemnify the Club against *all* loss, claims or expenses...." *Post,* 60 Mass. App.Ct. at 646, 805 N.E.2d at 66 (emphasis added). Also, whereas the MYC By–Laws state that "[s]aid absolution from liability shall include *but not be limited to* " (# 48, Exh. 1, Art. XXIII § 2) (emphasis added), the *Post* exculpation clause says "*including without limitation.*" *Post,* 60 Mass.

App.Ct. at 646, 805 N.E.2d at 66 (emphasis added). Combining the rule of law from *Broadley* and the instruction that *Post* provides, the Court shall sever the over broad language—cutting out the word "any" and the phrase "including but not limited to: (a) Fire; (b) Theft; (c) Vandalism; (d) Water Damage; (e)"—and leave the remaining language as it stands. *Broadley,* 471 F.3d at 275–76. *See also Greenly,* 192 F.3d at 25–26. After excising the expansive language, MYC's clause is not overly broad and can be read to absolve the Club of liability in the circumstances of the case at bar.

### 2. *Boilerplate Character*

The MYC exculpatory clause is boilerplate in nature in the sense that it appeared as a standard clause in the Club's By–Laws year after year. That being said, the members of MYC have input into the content and viability of the By–Laws. The By–Laws set forth an adoption provision which reads:

> These By–Laws with appended rules and regulations, when adopted at a general meeting, and approved by a two-thirds majority of those present at such meeting, and when approved by the Board of Trustees shall replace any and all previous By–Laws, rules and regulations.

# 48, Exh. 1, Art. XXV.

Moreover, the By–Laws also incorporate a mechanism by which they can be amended. Specifically, Article XXV states that:

> These By–Laws, or any of them, may be altered, amended, repealed by a vote of two-thirds of the members present and voting at any annual or special meeting called for the purpose and at which a quorum is present, provided that the notice of said meeting shall specify the general nature of the subject matter of the proposed alteration,

amendment or repeal of the articles to be effected thereby.

# 48, Exh. 1, Art. XXV.

Thus, the exculpatory clause in the By–Laws was, at some point in time, approved and adopted by the then-members of MYC and Board of Trustees, and it is subject to amendment or repeal if two-thirds of the members so agree.

Further, the MYC By–Laws are tailored to the Club and its needs; they are not a standard form.

### 3. Lack of Specific Negotiation

■ Although there was no actual negotiation between MYC and the boat owners as to the exculpatory clause, the clause was specifically tailored to MYC's needs and the members had an ongoing right to seek to change the clause. *See Post,* 60 Mass.App.Ct. at 649–50, 805 N.E.2d at 68–69. The boat owners argue that the content of the By–Laws and rules was not negotiated at any time prior to, during, or after signing their membership applications. (# 59 at 26–27) They also contend that "the exculpatory clause contained in the by-laws and rules was drafted and in place long before any of the boat owners became members of the club." (# 59 at 26–27) MYC counters that the boat owners had " 'constant opportunity to 'negotiate' changes in the membership agreement' by amending MYC's By–Laws and by voting annually for Officers.". (# 50 Part I.C.3) (quoting *Post,* 60 Mass.App.Ct. at 649–50, 805 N.E.2d at 68–69).

In *Broadley,* the Marina did "not suggest that there was actual negotiation about such terms." *Broadley,* 471 F.3d at 276. The First Circuit noted that "[i]f the negligence issue had been the subject of actual bargaining and discussion, we might well have a different reaction[.]" *Broadley,* 471 F.3d at 276. Further, "where the parties actually negotiated an overbroad

exculpatory clause that clearly encompasses negligence, a good case can be made for narrowing it to apply only to negligence, ... but ... '[t]he fact that the [overbroad] term is contained in a standard form supplied by the dominant party argues against aiding him in this request.' " *Broadley,* 471 F.3d at 275 (quoting Restatement (Second) of Contracts § 184 cmt. b, illus. 4). Unlike the Marina's clause in *Broadley,* MYC's exculpatory clause was specifically tailored to the Club's needs. *See Broadley,* 471 F.3d at 273. For example, MYC's clause mentions "damages to any boat ... [that] the Club premises shall include but not limited to docks, floats, *storage, and lift facilities for said boats* .... [and that the] absolution from liability shall include but not be limited to: (a) Fire; (b) Theft; (c) Vandalism; (d) Water damage; (e) Negligent acts or omissions." (# 48, Exh. 1 Art. XXIII § 2) (emphasis added) The mention of "boats," "docks, floats, storage, and lift facilities for said boats," and "[w]ater damage" signifies that this clause is customized for MYC's purpose. (# 48, Exh. 1 Art. XXIII § 2) The exculpatory clause in *Broadley,* however, does not have a similar unique character to it. *See Broadley,* 471 F.3d at 273.

Although there was no actual negotiation that took place when each of the boat owners in the instant case signed their membership applications or winter storage applications, "there was nothing preventing the boat owners from attempting to negotiate the terms of the [membership/winter storage application] or refusing to enter into the contract and docking, mooring, or otherwise keeping their vessels at some other location." *In re Stanton,* 2005 WL 2035586, at *8. *Broadley* and *In re Stanton* both dealt with marinas. MYC, on the other hand, is a non-profit organization which limits membership to 210 and involves a strict application pro-

cess to join, including the requirement that each member must obtain "the recommendation of two (2) members in good standing who personally know the applicant." (# 48, Exh. 1, Art. XVII § 1 ¶ 1, § 11) The *Post* case is factually comparable and thus provides valuable guidance.

In *Post*, the Massachusetts Appeals Court affirmed the validity of an exculpatory clause at a Country Club on summary judgment. *Post*, 60 Mass.App.Ct. at 654, 805 N.E.2d at 72. At the time of the accident, Post had been a member of the Club for ten years and "[w] hen Post became a member of the club, he entered into an obligation, in the nature of a contract, to be bound by the club's rules and by-laws, and accepted all obligations that were not inconsistent with law." *Post*, 60 Mass.App.Ct. at 647, 805 N.E.2d at 67 (citing to Massachusetts law for the proposition that members of clubs, societies, associations, and organizations are charged with knowledge of the by-laws or rules).

Further, even though some of the members did not possess a copy of the By–Laws until after they signed their membership applications—in some cases, a year after, but in all cases well before November of 2006 [8]—they had an ability to seek to change the By–Laws. (Young: # 48, Exh. 18 at 47:3–17; Maloney: # 48, Exh. 19 at 44:3–9; Arnone: # 48, Exh. 20 at 106:18–24; Salvucci: # 48, Exh. 21 at 37:7–20; Martin: # 48, Exh. 22 at 11:15–12:24) All of the boat owners in the instant case had attended a membership meeting prior to the fire and were aware that the By–Laws could be amended. (Young: # 48, Exh. 18 at 11:17–12:10, 71:19–73:15;

Maloney: # 48, Exh. 19 at 14:2–24, 68:1–71:1; Arnone: # 48, Exh. 20 at 27:9–28:25, 68:12–17; Salvucci: # 48, Exh. 21 at 17:10–21, 19:19–20:5; Martin: # 48, Exh. 22 at 30:24–31:10) With no admiralty law directly on point, *Post* provides that

> [t]he membership had, in effect, the constant opportunity to negotiate changes in the membership agreement, including the indemnity clause. Because members retain the right to change those terms by majority vote, or the election of new officers, with the constant opportunity to 'negotiate' changes in the membership agreement, the contract here differs substantially from that where a consumer, in order to acquire needed goods and services, is required to accept its terms on a take it or leave it basis.

*Post*, 60 Mass.App.Ct. at 649–50, 805 N.E.2d at 68–69.

Lastly, as discussed at oral argument, the nature of the organization is relevant where MYC is a non-profit, limited membership, self-sustaining, common-interest group and the only money it generates is funneled directly back into its daily operations. It makes fiscal sense for such a club which is without the resources appurtenant to a for-profit institution to limit its liability in order to preserve its viability.

In light of the nature of the organization, the fact that the boat owners had the "the constant opportunity to negotiate changes in the" By–Laws, and the fact that the By–Laws were already specifically tailored to fit the needs of MYC, the specific negotiation factor will not weigh

---

**8.** An argument is made that the boat owners cannot be bound by the provisions of the MYC By–Laws because they did not receive copies before, or at the time, they applied to become members of the Club. However, it is undisputed that in their annual slip application, the members sign directly below a statement which reads "[t]he owner/master further acknowledges that these provisions are in addition to the Dock & Float Rules and Bylaws of the Metropolitan Yacht Club, which the owner/master hereby ratifies and confirms. (# 48, Exh. 7–11B)

against the validity of MYC's exculpatory clause.

### 4. Absence of Specific Reference to Negligence

■ In *Broadley*, the First Circuit declined to narrow the exculpatory clause, in part due to the fact that the exculpatory clause in that case "never sa[id] that it exempt[ed] Marina from negligence." *Broadley*, 471 F.3d at 275. *Broadley* instructs that the probability of conveying "an *effective* warning to the reader" is important and suggests that a "clear and specific disclaimer of liability for *negligence*" might effect such a warning. *Broadley*, 471 F.3d at 275 (emphasis in original). Not only does the MYC clause make direct reference to negligence, it also specifically states that MYC is absolved from liability due to "fire." (# 48, Exh. 1, Art. XXIII § 2) The explicit reference to both negligence and fire provided a clear, forthright warning to the reader and, therefore, cannot be viewed as a reason to refrain from narrowing the exculpatory clause.

### 5. Presence of an Attorney's Fees Clause

■ The MYC exculpatory clause does not contain an attorney's fees clause. (# 48, Exh. 1, Art. XXIII) *Broadley* states that a negative consequence of such a provision is that "[t]he injured slip-renter often has ample reason to hesitate about suing—time, uncertainty, expenses—especially where . . . the contract provides for attorney's fees to [MYC] for breach of the agreement not to sue." *Broadley*, 471 F.3d at 275. Where, as here, there is no attorney's fees clause [9], it obviously cannot be viewed as a barrier to narrowing the exculpatory clause.

After carefully considering and weighing all of these factors, the Court is of the view that the unlawful provisions of the MYC exculpatory clause may properly be severed, and that the remainder of the red letter clause is valid and enforceable. The MYC exculpatory "clause represents fair dealing so that a judicial narrowing is sound public policy." *Broadley*, 471 F.3d at 275.

### C. Integration of By–Laws and Winter Storage Application

■ The By–Laws apply to all of the members at MYC regardless of whether the members stored their boat at the Club for the winter. The boat owners claim that they considered the Winter Storage Application to have governed the winter storage of their boats—that it governed a separate service and that the By–Laws are a distinct contract. (# 59 Part II) The boat owners further claim that "MYC cannot be allowed to exculpate itself from negligence by reference to different documents and language," because "there is no mention of exculpation for negligence, indemnification or release from liability by boat owners to MYC" on the Winter Storage Application. (# 59 Part II) MYC argues that the By–Laws apply to the members who use MYC for winter storage and further claims that there is no need to look at whether the two contracts integrate because the Winter Storage Application was just that, an application. (# 50 Part III.A)

In support of their position the boat owners rely on a Massachusetts Appeals case, *Gilmore v. Century Bank and Trust Co.*, 20 Mass.App.Ct. 49, 56, 477 N.E.2d 1069, 1073 (1985), because there is no applicable admiralty law. *See Persson*, 330 F.3d at 32; *Greenly*, 192 F.3d at 25–26. In that state case, the Court held that

---

**9.** There is an attorney's fees clause in Article XXIV—for indemnification—of MYC's By-Laws, however, the indemnification is for its trustees. (# 48, Exh. 1, Art. XXIII)

"such factors as simultaneity of execution, identity of subject matter and parties, cross-referencing, and interdependency of provisions" are helpful in determining whether two documents can be read together. *Gilmore*, 20 Mass.App.Ct. at 56, 477 N.E.2d at 1073 (citing *Chelsea Indus., Inc. v. Florence*, 358 Mass. 50, 55, 260 N.E.2d 732 (1970)). In the instant case, the parties are the same, and the two contracts cover overlapping aspects of the relationship; the By–Laws speak to exculpation and docking rules and the Winter Storage Application is tailored towards applying for docking space. (# 48, Exh. 1, Art. XXIII; Dock and Float Rules; # 48, Exh. 12–16) However, the Winter Storage Application did not cross-reference the By–Laws and the two contracts were not executed simultaneously. (# 48, Exh. 2–6, 12–16) Thus, under the *Gilmore* decision, the outcome is uncertain.

In any event, the *Gilmore* case is not dispositive because it is not necessary that the two documents be read as one. Rather, both contracts can apply and the construction of the latter—the Winter Storage Application—can turn on the application of intentions manifested in the former. The better rule, as applied to the facts of this case, is laid out in *Chelsea Industries, Inc. v. Florence*, 358 Mass. 50, 55, 260 N.E.2d 732 (1970). In that case, the Massachusetts Supreme Judicial Court held that an exculpatory clause that was contained in an employment contract but not in a purchasing contract, applied to both contracts because they

> were closely interrelated [,] [t]he employment contract was contemplated by the purchase contract[,] ... [the] term of employment ... was tied to a provision of the purchase contract [,] ... the employment contract stated that it 'and any written agreements entered into at the same date constitute the entire contract between the parties[, and] ... the

two provisions deal in very similar, but not precisely the same, manner with the same subject matter.'

*Chelsea Industries*, 358 Mass. at 55, 260 N.E.2d at 735–736 (quoting the contract) (citations and footnote omitted).

Further, in Chelsea Industries, the two documents were read as one contract even though the purchase contract made no reference to the section of the employment contract that was at issue. *Chelsea Industries*, 358 Mass. at 55, 260 N.E.2d at 736. While the two documents were executed contemporaneously, "the parties to the two contracts were not the same." *Chelsea*, 358 Mass. at 55, 260 N.E.2d at 735.

> Williston teaches that
>
> reference to an extraneous document may be essential to the interpretation and construction of a contract because, even though the writings in question were neither executed on the same day, nor made by the same parties, the later writing may so far pertain to the same transaction as the earlier that its meaning at the time and place that it was made can be understood only by reference to the earlier writing.

11 *Williston on Contracts* § 30:26 (4th ed.) (footnotes omitted).

■ Further, "a contract should be construed in the light of a previous contract which is evidently designed to control the relations of the parties for a period covered by the latter contract, unless the latter contract in manifestly an abrogation of the former." *Starr Co. v. Columbia Broadcasting System*, 68 Ohio App. 352, 356, 36 N.E.2d 861, 864 (1941). *See also Opportunity, L.L.C. v. Ossewarde*, 136 Idaho 602, 607, 38 P.3d 1258, 1263 (2002) ("The making of a new contract does not necessarily abrogate a former contract unless it explicitly rescinds it, deals with the subject matter so comprehensively as to be

complete in itself, or is so inconsistent with the first contract that the two cannot stand together."). Thus, whether Article XXIII applies to MYC members is a question quite apart from the question of whether the Winter Storage Application *also* controls the contractual agreement to store the members' boats on MYC premises for the winter. That is, the fact that an independent contract was entered into between MYC and some its members, i.e., the Winter Storage Application, does not necessarily negate the application of the By–Laws which are "equally binding on ... the general membership." (# 48, Exh. 1 at 25)

It is true that the summer Slip Application references the By–Laws and the fact that they are binding upon the members. (# 48, Exh. 7–11B) *See also Opportunity, L.L.C.,* 136 Idaho at 607, 38 P.3d at 1263 ("[W] hen a subsequently executed agreement specifically references and relies on a former agreement, the two are to be interpreted together, if possible."). While the Winter Storage Application did not explicitly reference the By–Laws, it did not purport to supercede or nullify the By–Laws either.[10] *See* 11 *Williston on Contracts* § 30:26 (4th ed.) ("[T]wo agreements of a similar nature between the same parties will not be read together where the later one expressly states that it supersedes and annuls the prior one.") (footnotes omitted). It could not have been the intention of the parties that the By–Laws were inoperative as to the boat owners who participated in winter storage at the Club because: 1) The By–Laws state that they are "equally binding on ... the general membership"; 2) the By–Laws did not explicitly exempt application to members who have stored their boats at MYC for the winter; and 3) only members can store their boats at MYC during the winter.[11] MYC could not have intended that the By–Laws not apply to members who stow their boats at the MYC during the winter while at the same time remain applicable to all other members. Such a construction would be unjust and arbitrary as completely contradictory to the intent of the drafter. *Stop & Shop, Inc. v. Ganem,* 347 Mass. 697, 701, 200 N.E.2d 248, 251 (1964) ("Justice, common sense and the probable intention of the parties are guides to construction of a written instrument.").

It is noted that the boat owners make reference, in a footnote of their brief, to the fact that "MYC often paid member boat owners for damage that occurred to their boats at the club, thereby ignoring the terms of the by-laws." (# 59 at 11 ¶ 13; Part II at 31 n. 4) Indeed, some sums were paid out to members for minor damages at the discretion of the Board under the By–Laws. (# 48, Exh. 1, Art. XII § 3) Specifically, the pertinent section of the By–Laws states that the Board of Trustees "shall have the authority to incur any expense not included in the approved budget in an amount not to exceed $5,000.00." (# 48, Exh. 1, Art. XII § 3) Richard H. Kream explained in an affidavit that "[t]hese payments included a broken windshield, hull damage resulting from the travel lift's slings, damage to a bow spotlight, and fiberglass scratches .... [and that they] were considered by the Board of Trustees *to be gifts made to individual members in the interests of expediency and good will rather than admissions of any responsibili-*

---

10. There was no express merger or integration clause in the Winter Storage Application stating that the Winter Storage Application consisted of the entire agreement. (# 48, Exh. 12–16)

11. Because the MYC Dock and Float Rules state that "[n]o slip assignment shall be made until an application for membership has been accepted," only members are able to store their boats at MYC. (# 48, Exh. 1, Dock and Float Rules § 2 ¶ 11)

ty of the club." (# 49¶ ¶ 5–6) In the absence of any factual dispute regarding Mr. Kream's characterization of these payments, they cannot be deemed to give rise to an inference that MYC did not follow its By–Laws.

In sum, because the By–Laws apply to all members of MYC even during winter storage, the boat owners are restricted from bringing any cause of action for simple negligence under the exculpatory clause, as limited. Summary judgment is granted in favor of the MYC on the negligence claims.

## D. Breach of Contract and Bailment Claims

The boat owners claim that MYC breached an express or implied contract reasonably to protect the personal property at issue (# 22¶ ¶ 12–15; # 40¶ ¶ 12–15) and a contract of bailment in that their personal property was delivered to MYC, MYC had exclusive care, custody, and control over the personal property, and that MYC breached its duty by failing to return the personal property to the boat owners in the same condition. (# 22 ¶ ¶ 16–25; # 40 ¶ ¶ 16–25) MYC asserts that it never had exclusive care, custody, and control of the boats and that the Dock and Float Rules provide that "[b] oat owners assume all risks of any damage incurred during the storage period." (# 48, Exh. 1, Dock and Float Rules § 5)

## 1. Negligent Breach of Contract

■■ As previously established, the By-Laws apply to the members who are parties in this case, and the exculpatory clause, as reformed, exculpates MYC from ordinary negligence. The contract claims as alleged are based on *negligent* breach, i.e., the failure "to install and/or maintain the electrical system on their docks in a reasonably safe manner" and the failure to protect the property of the boat owners "with reasonable care." These contract claims fall under the exculpatory clause and, as such, the boat owners' claims for breach of contract are not cognizable. MYC is entitled to the entry of summary judgment on the breach of contract claims.[12]

## 2. Breach of Contract of Bailment

■■■ A bailment "is the delivery of goods by their owner to another for a specific purpose, and the acceptance of those goods by the other, with the express or implied promise that the goods will be returned after the purpose of the delivery has been fulfilled." *Goudy & Stevens, Inc. v. Cable Marine, Inc.*, 924 F.2d 16, 18 (1st Cir.1991) (citing 9 *Williston on Contracts*, § 1030, pp. 875–76). In a case involving a marine fire, Judge O'Toole stated that

> Bailment relationships are often found when a boat is left with a marina for storage or repairs and the marina is given exclusive right to possession of the vessel. But where, as here, the marina simply provides docking space to the boat owners and is not given the exclusive right to control the vessels, no bailment relationship is created. [The marina and its trustees] are entitled to summary judgment on the bailment claims directed at them.

*In re Stanton*, 2005 WL 2035586, at *10 (citations omitted).

---

12. MYC also argues that Section 6 of the By-Laws extinguishes the boat owners' contract claims. (# 48, Exh. 1, Art. XXIII § 6) In pertinent part, Section 6 states that "[t]he Club shall not be liable to the boat owner … for any loss or damage to his property or person … resulting from any breach of any contract, agreement, or work order." (# 48, Exh. 1, Art. XXIII § 6)

In this case, MYC did not have *"exclusive right to possession of the vessel." In re Stanton,* 2005 WL 2035586, at *10(emphasis added). Instead, the members had free access to their boats at any time while storing them at MYC. (Young: # 48, Exh. 18 at 27:10–28:6, 30:12–31:8; Maloney: # 48, Exh. 19 at 15:13–16:11, 22:1–13, 37:18–21; Arnone: # 48, Exh. 20 at 33:1–21; Salvucci: # 48, Exh. 21 at 47:18–51:8; Martin: # 48, Exh. 22 at 9:7–10:3, 28:3–29:18) Since such free access by the owners negates an essential element in a prima facie bailment claim, i.e., that MYC had the exclusive right of possession of the members' vessels, MYC is entitled to the entry of judgment in its favor on the bailment claims.

### *V. Conclusion*

For the foregoing reasons, it is ORDERED that Defendant Metropolitan Yacht Club, Inc.'s Motion For Summary Judgment (# 48) be, and the same hereby is ALLOWED. IT IS FURTHER ORDERED that pertinent clauses of Section 2 of Article XXIII of the By–Laws are SEVERED so that Section 2 shall read as follows:

> The Club expressly absolves itself and its servants, agents, and employees and each member agrees that the Club may absolve itself from any liability for damages to any boat, property, appurtenances and contents thereof, or for damages to any property of each member or anyone upon Club premises under right or privilege of each member. Club premises shall include but not [be] limited to docks, floats, storage, and lift facilities for said boats. Said absolution from liability shall include but not be limited to: ~~(a) Fire; (b) Theft; (c) Vandalism; (d) Water damage; (e)~~ Negligent acts or omissions.

### *VI. Postscript*

While the Court has no doubt that the result reached and the reasons therefor represent its best efforts to apply the law, especially the law as set forth in the *Broadley* case, to the facts of this case, the question is somewhat close. As Judge Boudin stated in *Broadley,* the issue involves "... poorly developed and confusing admiralty law ...", *Broadley,* 471 F.3d at 277, and although the Court in *Broadley* set forth the factors which are to be considered when deciding whether to narrow an exculpatory clause, *id.* at 276, there have been no cases applying those factors since the *Broadley* case was decided, and specifically none dealing with an exculpatory clause in the bylaws of a yacht club which can be amended by the affected members. In these circumstances, the Court shall hear counsel as to whether they wish the opportunity to appeal this decision prior to proceeding further with this case. A further status conference shall be set to discuss that question.